2000 UT 32

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Henry Thomas DeBOOY, Defendant and Appellant.**

**No. 981172.**

Supreme Court of Utah.

Feb. 4, 2000.

Jan Graham, Att'y Gen., Joanne Slotnick, Norman Plate, Asst. Att'ys Gen., Craig Halls, Monticello, for plaintiff.

Rosalie Reilly, Monticello, for defendant.

## AMENDED OPINION

### On Certification from the Utah Court of Appeals

DURHAM, Associate Chief Justice:

¶ 1 Henry Thomas DeBooy was charged with possession of a controlled substance, possession of illegal fireworks, and littering after being stopped at a highway checkpoint in San Juan County on May 23, 1997. Defendant's counsel filed a motion to suppress the evidence obtained at the checkpoint. After an evidentiary hearing, the Seventh Judicial District Court denied the motion. DeBooy then entered conditional guilty pleas to possession of a controlled substance, a third degree felony, and littering, a class C misdemeanor.[1] On appeal, defendant argues that the checkpoint violated his constitutional rights against unreasonable search and seizure, and that the trial court erred in denying his motion to suppress.[2]

## FACTS

¶ 2 On May 21, 1997, an application for an administrative highway checkpoint was made to Justice Court Judge Lyon W. Hazleton, pursuant to Utah Code Ann. § 77–23–104.[3] The application stated that the checkpoint was to take place on May 23, 1997, between the hours of 2 p.m. and midnight. The stated purpose was to inspect and/or detect:

(a) License plates, registration certificates, insurance certificates, and driver's licenses.

(b) Compliance with seat belt and child restraint laws.

(c) Drivers that may be under the influence of alcohol and/or other substances.

(d) Other alcohol and/or controlled substance violations.

(e) Vehicle equipment violations.

(f) Compliance with commercial vehicle regulations.

The application also stated that all cars were to be stopped, and that once it was determined that no violation was present, they would be allowed to proceed. Judge Hazelton signed the application authorizing the checkpoint. He indicated that he had reviewed the plan, and determined that it would appropriately:

1. Minimize:

a) The length of time motorists will be delayed;

b) the intrusion of the inspection or inquiry;

c) the fear and anxiety of the motorist;

---

1. The possession of illegal fireworks charge was dismissed.

2. This appeal was certified to this court by the Utah Court of Appeals pursuant to Utah Code Ann. § 78–2a–3(3) (1996).

3. This section, which has not been substantively altered since the application for the checkpoint was approved, requires magistrate authority for such checkpoints. *See* Utah Code Ann. § 77–23–104 (1999).

d) the discretion left to the officers operating the checkpoint.

2. Maximize the safety of the motorists and enforcement officers.[4]

Judge Hazelton indicated that he was authorizing the checkpoint based on this determination.

¶ 3 On May 23, 1997, the officers stationed at the checkpoint noticed a car off in the distance proceeding at a very high rate of speed. As the car, a black BMW convertible driven by defendant, approached the checkpoint, the officers observed it slow down and pull off towards the side of the road. The officers testified that defendant then raised his hand in the air and threw something "very light" from the vehicle.

¶ 4 While several officers walked down the road to retrieve what defendant had discarded, one officer asked defendant, now stopped at the checkpoint, for his driver's license, vehicle registration, and insurance. He also asked defendant what he had thrown from the vehicle, and defendant replied that it was a tissue. When asked why he had discarded it, defendant responded that he did not know. At this point, another officer, stationed by the passenger side of the vehicle, asked defendant whether he had any alcohol or drugs. When defendant replied that he did not, the officer asked if they "could take a quick look in the vehicle." Defendant consented and three officers then searched the vehicle, discovering contraband in a backpack in the trunk.

¶ 5 Defendant was then arrested and charged with possession. He subsequently entered a conditional guilty plea, pending the outcome of his motion to suppress. Ruling from the bench, the trial court denied the motion to suppress. The court found the checkpoint complied with section 77–23–104, and declined to hold that statute unconstitutional, but indicated that better guidance from this court was needed on the issue.

¶ 6 Defendant now argues that the checkpoint in question violates both the Fourth Amendment of the United States Constitution and article I, section 14 of the Utah Constitution. He argues that the evidence

was obtained as a result of this illegal checkpoint and must therefore be suppressed.

■ ¶ 7 The trial court's ruling on the suppression issue, based on the legality of the checkpoint, is a question of law which we review for correctness, granting no deference to its conclusions. *See State v. Harmon*, 910 P.2d 1196, 1199 (Utah 1995).

## ANALYSIS

¶ 8 We first address the State's argument that defendant's allegedly throwing the tissue out of the vehicle created a reasonable suspicion separate from the checkpoint. The State argues that this alone justified the stop and search of defendant's vehicle, making it unnecessary to address the legality of the checkpoint itself. We find this argument to be without merit.

¶ 9 We agree that the act of pulling off to the side of the road and throwing the object from the vehicle while approaching the police checkpoint created a reasonable suspicion of possession of contraband. This conclusion, however, cannot possibly be reached independent of the checkpoint itself.

¶ 10 First, the only reason the officers were present to view defendant's actions was because of the checkpoint. Second, the only reason defendant's actions were suspicious is that he was approaching the checkpoint when he discarded the tissue. Simply throwing something "very light" out of a moving vehicle does constitute littering, but it does not create reasonable suspicion of possession of contraband. Doing so on the side of the road while approaching a police checkpoint clearly does. Were there no checkpoint, defendant's actions would not have been suspicious. Therefore, in determining the legality of the search, we must address the legality of the checkpoint itself. *See Sims v. Collection Div. of the Utah State Tax Comm'n*, 841 P.2d 6, 8–15 (Utah 1992).

¶ 11 Defendant raises arguments against the legality of this checkpoint under both the Fourth Amendment of the United States Constitution and article I, section 14 of the Utah Constitution. Following oral argu-

---

4. This language authorizing the checkpoint was taken directly from section 77–23–104.

ment, we asked the parties for additional briefing on the constitutionality of section 77–23–104 under these provisions. The State now asserts that defendant's state constitutional argument is not properly before this court. We disagree. Defendant argued in his motion to suppress that the evidence was obtained against him in violation of article I, section 14 and cited cases from this court interpreting that provision. Defendant also argued that the State has the burden of proving the constitutionality of the statute. In his initial brief to this court, and in oral argument, defendant again raised arguments against the checkpoint under article I, section 14. We therefore find the question of the checkpoint's constitutionality under article I, section 14 to be properly before this court and address it on the merits under both the Fourth Amendment of the United States Constitution, and article I, section 14 of the Utah Constitution.

¶ 12 These provisions contain identical language.[5] They have not, however, always been interpreted in the same way. While this court's interpretation of article I, section 14 has often paralleled the United States Supreme Court's interpretation of the Fourth Amendment, we have stated that we will not hesitate to give the Utah Constitution a different construction where doing so will more appropriately protect the rights of this state's citizens. *See State v. Watts*, 750 P.2d 1219, 1221 n. 8 (Utah 1988); *State v. Hygh*, 711 P.2d 264, 271–273 (Utah 1985) (Zimmerman, J., concurring). For example, we have held on more than one occasion that article I, section 14 provides a greater expectation of privacy than the Fourth Amendment as interpreted by the United States Supreme Court. *See State v. Thompson*, 810 P.2d 415, 416–18 (Utah 1991) (depositor's bank records); *State v. Larocco*, 794 P.2d 460, 465–71 (Utah 1990) (vehicle identification number in motor vehicles).

¶ 13 The search and seizure provisions of both the United States and Utah Constitutions prohibit sweeping, dragnet-type detentions of ordinary people engaged in peaceful, ordinary activities. Under both constitutions, the general rule is that "specific and articulable facts ... taken together with rational inferences from those facts, [must] reasonably warrant" the particular intrusion. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

¶ 14 The United States Supreme Court has, however, carved out an exception to that general rule for highway checkpoints, provided that certain criteria are met. In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court addressed the constitutionality of such checkpoints. The decision involved permanent immigration checkpoints operated by the border patrol, but located at highway intersections over 65 miles from the international border with Mexico. The sole purpose of these checkpoints was to search for illegal aliens traveling through the country. The location was chosen for its presence along a frequent route for such passage. *See id.* at 549, 551–53, 96 S.Ct. 3074.

¶ 15 At the checkpoints, all northbound vehicles were brought to a "virtual, if not a complete, halt." *Id.* at 546, 96 S.Ct. 3074. A "point" officer then made a preliminary determination as to whether further inquiry was required. Vehicles requiring further inquiry were directed to a secondary inspection area. Those vehicles which did not were allowed to proceed. Most motorists were allowed to resume their progress in a matter

---

**5.** Article I, section 14 of the Utah Constitution states:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Utah Const. art I, § 14.

The Fourth Amendment of the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

of seconds without any oral inquiry or visual examination. *See id.*[6]

¶ 16 The Court held these checkpoints were constitutional under the Fourth Amendment. Specifically, the Court held that the checkpoints constituted a "seizure," but found them reasonable in advancing the valid governmental interest in detecting illegal aliens. *See id.* at 556, 562, 96 S.Ct. 3074. Border checkpoints had proved inadequate in preventing illegal entries because the nearly 2,000–mile–long border with Mexico allows easy access to millions of illegal aliens each year. *See id.* at 552, 556, 96 S.Ct. 3074. Once within the country, the aliens are often picked up by friends or relatives and transported to other states on interstate highways. *See id.* at 552, 96 S.Ct. 3074. The Court concluded that the government's interest in apprehending illegal aliens justified the use of checkpoints on interstate highways and that the connection between the checkpoint and the governmental need was direct and strong because the highways were the means used to disperse the aliens. *See id.* at 561–62, 96 S.Ct. 3074.

¶ 17 In *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court upheld a sobriety checkpoint operated by the Michigan highway patrol. At the checkpoint in *Sitz*, all passing vehicles were stopped and the drivers briefly examined for signs of intoxication. If an officer detected signs of driver intoxication, the driver was directed to a location out of the flow of traffic to check his driver's license and registration and, if warranted, administer further sobriety tests. All other drivers were permitted to resume their journey immediately. Most motorists were delayed approximately twenty-five seconds. *See id.* at 447, 110 S.Ct. 2481. As with illegal immigration in *Martinez–Fuerte*, the Court noted the valid state interest in preventing drunk driving and emphasized the seriousness of the problem of highway safety. *See id.* at 451, 110 S.Ct. 2481. Additionally, the Court ob-

served that, prior to establishing the checkpoint, the police had appointed a committee to "create guidelines setting forth procedures governing checkpoint operations, cite selection, and publicity," *id.* at 447, 110 S.Ct. 2481, and that the record contained empirical evidence that the checkpoints were in fact successful in apprehending drunk drivers, *see id.* at 455, 110 S.Ct. 2481. As in *Martinez–Fuerte*, the stop was very brief and for a limited purpose directly tied to the use of the highway.

¶ 18 *Martinez–Fuerte* and *Sitz* employed a balancing test from *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), weighing the state's interest and the checkpoint's effectiveness in advancing that interest against the intrusion upon the individual. *See id.* at 51, 99 S.Ct. 2637. In both *Martinez–Fuerte* and *Sitz*, the Court found this balance tipped in favor of the state. As noted by Professor LaFave:

> Lower courts, in upholding the operation of such checkpoints when proper procedures have been followed, typically stress the necessity (i) that the decision of where and when the roadblock is to be operated not be left to officers in the field; (ii) that the checkpoint be conducted in a regularized manner so as not to alarm those approaching and stopping at it; (iii) that all vehicles be stopped at the roadblock or at least that those which are stopped be selected by neutral criteria; (iv) that selective referral for continued investigation (and thus more than momentary detention) of some of those stopped be pursuant to the *Terry* reasonable suspicion test; and (v) that advance publicity be given to the forthcoming use of this enforcement technique.

2 Wayne R. LaFave et al., *Criminal Procedure* § 3.9(g), at 279–80 (2d ed.1999) (citations omitted).

¶ 19 The cases discussed above addressed the constitutionality of checkpoints under the Fourth Amendment, but we deem their anal-

---

**6.** The decision in *Martinez–Fuerte* actually addressed two checkpoints, one in California (described above), the other in Texas. The details of the Texas checkpoint were not fully elaborated. The Court stated that the second checkpoint gen-

erally resembled the first, but differed in that all vehicles were brought to a complete stop. The Court did not indicate the time of the average stop, stating only that it was brief. *See Martinez–Fuerte*, 428 U.S. at 550, 96 S.Ct. 3074.

ysis and rationale to be equally suitable for our independent consideration of the issues under article I, section 14 of the Utah Constitution. To the extent we rely upon federal cases decided under the Fourth Amendment for our analytical approach to reviewing administrative checkpoints under the Utah Constitution, we accept them solely for their persuasive value, and do not regard them as binding for purposes of state law.[7]

■ ¶ 20 The checkpoint in the instant case is far more intrusive than the checkpoints at issue in *Martinez–Fuerte* and *Sitz*. Those cases involved brief stops in which the police were searching for only one purpose, the presence of illegal immigrants in *Martinez–Fuerte*, and drunk driving in *Sitz*. Most motorists were allowed to proceed in a matter of seconds. In both cases, the records contained empirical evidence that the checkpoints advanced a valid state interest. More importantly, checking for sobriety is directly related to safety on the highways and to the right of the driver to drive on the highway. Searching for illegal immigrants was closely connected to the use of the highway; the highway itself was used for an illegal purpose on a widespread basis, i.e., the transportation of illegal immigrants to points inland where their discovery was very difficult.

¶ 21 In the present case, the State has a clear and compelling interest in promoting highway safety and keeping drunk drivers off the road. Drunk driving presents a grave danger to all motorists and threatens the safety of others using the highway.[8] A checkpoint such as the one in *Sitz* can advance the State's interest. However, the checkpoint in the present case was not limited to preventing drunk driving. At this checkpoint, the police conducted sweeping inspections of license plates, registration certificates, insurance certificates, driver's licenses, seat belt use, compliance with child restraint laws, vehicle equipment violations, and compliance with commercial vehicle regulations, in addition to checking for drivers under the influence of alcohol or other substances, as well as other alcohol or controlled substance violations.

¶ 22 When many legal violations are searched for, the purpose of the checkpoint becomes less a highway safety measure, and more a pretext to stop all vehicles to search for any and all violations of the law that might be apparent. This generalized stop and search, of course, occurs without any individualized suspicion of a crime having been committed, much less probable cause.

¶ 23 While checking for driver's licenses, registration, and insurance certificates may be reasonable at a sobriety checkpoint, this checkpoint went well beyond that inquiry. Particularly troubling here is the authority to "inspect and/or detect ... vehicle equipment violations." There is nothing in the record indicating why this was necessary at this particular checkpoint,[9] or more importantly, exactly what it means. Motor vehicle use is heavily regulated in this state, and there are numerous equipment problems which automobiles experience that constitute violations. Included among them are violations associated with lights, mufflers, horns, turn-signals, brakes, mufflers, windshields, and mirrors. *See* Utah Code Ann. § 41–1a–101 to –1402 (1998 & Supp.1999). According to testimony of the officers at the suppression hearing, there were no guidelines as to how their inquiry was to be conducted; it was left entirely to the discretion of the officers in the

---

7. This opinion announces an independent constitutional rule under article I, section 14 of the Utah Constitution, as well as our view of Fourth Amendment law pursuant to federal precedent. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

8. As noted in *Sitz*, "[d]runk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage." *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481 (citation omitted).

9. The State argues that the legislature's action in passing section 77–23–104 demonstrates the need for this inquiry. This argument is without merit. A reading of this section clearly demonstrates that it is a guide for how such checkpoints are to be approved and conducted. It applies to all such checkpoints conducted for any purpose. It does not mean, as the State's argument necessarily assumes, that the legislature has determined there is always a valid purpose for every checkpoint. This purpose must be demonstrated as to the particular checkpoint in question and each aspect of the inquiry. The State has failed to do so here.

field. For some vehicles, the officers might choose to check only the headlights, while others might be subjected to a full "diagnostic" exam. Both courses of action would constitute inspecting for vehicle equipment violations, but would have very different impacts on the occupants of the vehicles. Such unbridled discretion for the officers is inherently unreasonable under the Fourth Amendment and article I, section 14.

¶ 24 Similar problems have been addressed by other courts. In *United States v. Morales–Zamora*, 974 F.2d 149 (10th Cir.1992), the Tenth Circuit examined a police checkpoint in New Mexico purportedly set up to check for driver's licenses, vehicle registrations, and proofs of insurance. While motorists were stopped at the checkpoint, however, an officer walked by the cars with drug-sniffing dogs in search of contraband. *See id.* at 149. The court found this checkpoint to be an illegal pretextual stop and suppressed the evidence obtained against the defendant. *See id.* at 152–53; *see also Galberth v. United States*, 590 A.2d 990, 997–99 (D.C.1991) (holding license/registration checkpoint unconstitutional as real purpose was to search for drug traffic and violence); *Taylor v. United States*, 595 A.2d 1007, 1009 (D.C.1991) (holding license/registration checkpoint unconstitutional where this purpose was not furthered by roadblock, but where roadblock's primary purpose was stopping traffic congestion and the sale of drugs); *Meeks v. State*, 692 S.W.2d 504, 508 (Tex. Crim.App.1985) (holding roadblock to check drivers' licenses unconstitutional because roadblock's actual purpose was to enforce all laws). We are aware that a different result was reached in *Merrett v. Moore*, 58 F.3d 1547, 1550–51 (11th Cir.1995) (holding driver's license checkpoint was misused to detect drugs, but finding checkpoint constitutional so long as one purpose was valid). This holding was rejected by another court, however, which observed that *Merrett* was "the only court of appeals that has [so held]." *United States v. Huguenin*, 154 F.3d 547, 553 (6th Cir.1998). The court in *Huguenin* went on to state:

> We believe that the danger inherent in pretextual roadblocks is the potential for giving police the authority to stop every car on the road, question its driver and passengers under the guise of a legitimate traffic-related purpose, and then claim enough reasonable suspicion through, for example, the driver's expression or answers, to conduct a more thorough search of the stopped individuals and vehicles ... with insufficient limitations on police discretion.

*Id.* at 555.

¶ 25 Although the facts in these cases were somewhat different from the facts in the instant case, and the legal issues arose under the Fourth Amendment, the analysis used in them addressed issues central to article I, section 14, namely, whether the checkpoint served as an all-purpose criminal investigation conducted without any individualized suspicion. This concern relates to numerous concepts embodied in the Utah Declaration of Rights.

¶ 26 Broad-based, suspicionless inquiries are reminiscent of the much hated and feared general warrants issued by the British Crown in colonial days, where British officers were given blanket authority to search wherever they pleased and for whatever might pique their interest. It was precisely this type of activity that the Fourth Amendment was designed to prohibit. Indeed, the use of general warrants was an important factor giving rise to the American Revolution. *See Stanford v. State*, 379 U.S. 476, 481, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). This state's early settlers were themselves no strangers to the abuses of general warrants. Underlying the abuse of the general warrant was the perversion of the prosecutorial function from investigating known crimes to investigating individuals for the purpose of finding criminal behavior. A free society cannot tolerate such a practice.

■ ¶ 27 Defendant argues that section 77–23–104 is unconstitutional in that it requires the magistrate to authorize a checkpoint without scrutinizing the State's purpose in establishing that checkpoint. We disagree. Section 77–23–104 provides:

> (1) An administrative traffic checkpoint may be established and operated upon written authority of a magistrate.

(2) A magistrate may issue written authority to establish and operate an administrative checkpoint *IF*:

(a) a command level officer submits to the magistrate a written plan signed by the command level officer describing:

. . .

(iv) the purpose of the checkpoint, including the inspection or inquiry to be conducted; . . . *AND*

. . .

(b) the magistrate makes an independent judicial determination that the plan appropriately:

(i) minimizes the length of time the motorist will be delayed;

(ii) minimizes the intrusion of the inspection or inquiry;

(iii) minimizes the fear and anxiety the motorist will experience;

(iv) minimizes the degree of discretion to be exercised by the individual enforcement officers operating the checkpoint;

. . . .

(3) Upon determination by the magistrate that the plan meets the requirements of Subsection (2)(b), the magistrate *shall* sign the authorization. . . .

Utah Code Ann. § 77–23–104 (1999) (emphasis added).

■ ¶ 28 It is true that the language in section (2), "a magistrate *may* issue," appears to conflict with language in section (3), "the magistrate *shall* sign the authorization." *Id.* § 77–23–104(2), –104(3) (emphasis added). We have held, however, that legislative enactments are endowed with a strong presumption of validity and will not be declared unconstitutional unless there is no real basis upon which they can be construed as conforming to constitutional requirements. *See Greaves v. State*, 528 P.2d 805, 806–07 (Utah 1974). We have at times held this to be true even in cases where this court must engage

in "reconstructive surgery" in order to uphold the statute. *See In re a Criminal Investigation*, 7th District Court No. CS–1, 754 P.2d 633, 640 n. 6 (Utah 1988) (citing *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 107 Utah 502, 517–18, 155 P.2d 184, 191 (1945) (Wolfe, J., concurring)). We afford the statute in the present case the traditional presumption of constitutionality, but further conclude that reconstructive surgery is unnecessary. Subsection (2)(a) requires the officers to list the purpose of the checkpoint. Then, under (2)(b), the magistrate is required to make a determination that the plan appropriately minimizes:

a) The length of time motorists will be delayed;

b) the intrusion of the inspection or inquiry;

c) the fear and anxiety of the motorist;

d) the discretion left to the officers operating the checkpoint.

■ ¶ 29 In making this determination under subsection (2)(b), rather than uncritically accepting the State's purpose in establishing the checkpoint, as provided according to subsection (2)(a), the magistrate must first scrutinize this purpose to determine if it is valid, and to ensure each aspect of the checkpoint is necessary to achieve that purpose. If it is determined that the purpose is in fact valid, the magistrate must next scrutinize the plan according to the considerations in subsection (2)(b) to ensure each aspect of the checkpoint is necessary. Finally, this determination must be conducted with a view to meeting the constitutional standards contained in article I, section 14 and the Fourth Amendment.

¶ 30 Although the magistrate stated that he made this determination, a review of the plan shows that it did not in fact occur. The State did not meet its burden of demonstrating why it was necessary to search for equipment violations at a sobriety checkpoint.[10] More importantly, the plan failed to provide any guidelines as to what such a search

---

10. Of course, obvious equipment violations which can be observed from the exterior of a vehicle will always give police an adequate reason to stop. However, when vehicles are stopped at a checkpoint without any individualized suspicion, police may conduct only examinations which are necessary to achieve the *valid* purpose of the checkpoint. Further, when such examinations are necessary, they must be conducted in such a way as to minimize the discretion of the individual officers. Clearly, this was not the case here.

should entail or how it should be conducted. As discussed above, this decision was left entirely to the discretion of the officers in the field. Such unbridled discretion violated subsection (2)(b) of section 77–23–104, the Fourth Amendment, and article I, section 14 of the Utah Constitution.

¶ 31 Magistrate authorization of checkpoints must be narrowly tailored and limited to inquiries directly linked to promoting safe use of the highways. As stated above, checkpoints are an exception to the general rule that even a brief detention requires reasonable individualized suspicion. They are a narrow exception, however, and must be limited to circumstances such as those in *Martinez–Fuerte* and *Sitz*, which involved very narrow and brief detentions closely related to the use of the highway. Multi-purpose, general warrant-like intrusions on the privacy of persons using the highways are unacceptable. The broader the authorization by the magistrate and the greater the discretion of the officer at the checkpoint, the more suspect the constitutionality of the checkpoint under article I, section 14.[11]

¶ 32 This standard is necessary to safeguard the rights of the citizens of this state against unreasonable searches and seizures. It is "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men" that demands an independent and proper judicial determination. *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

¶ 33 Accordingly, we find that the checkpoint in the present case violates the Fourth Amendment and article I, section 14 of the Utah Constitution. We sustain the constitu-

tionality of section 77–23–104, but determine that the checkpoint in this case was not properly authorized under its provisions. We also hold that the evidence obtained against DeBooy as a result of this illegal checkpoint must be excluded.[12]

¶ 34 Accordingly, the decision of the trial court in denying defendant's motion to suppress is reversed.

¶ 35 Justice STEWART and Justice ZIMMERMAN concur in Associate Chief Justice DURHAM's opinion.

HOWE, Chief Justice, dissenting:

¶ 36 I dissent. I would affirm the trial court in denying defendant's motion to suppress. Although the magistrate's order authorizing a checkpoint to detect vehicle equipment violations could conceivably be overly broad if an officer unreasonably detained a motorist while conducting an extensive search for equipment violations, that was not the case here. The defendant here was not unreasonably detained; in fact, no search was made for equipment violations. Instead, defendant was stopped and asked for his driver's license, vehicle registration, and proof of insurance, and whether he had any alcohol or drugs. Those inquiries were admittedly proper. He then consented to the officer's request to search the vehicle. All of this was done quickly and without the unreasonable delay that might take place if an extensive investigation of equipment violations was made. Defendant must be judged on the facts of this case, not on the "worst case" scenario posited by the majority opinion.

---

11. Our holding today applies only to suspicionless, investigatory, nonemergency checkpoints. We do not address, for example, emergency roadblocks that might be used to apprehend a fleeing felon. Nor do we address any existing authority to conduct roadblocks for traffic control purposes. Finally, we do not address the constitutionality of fish and game roadblocks, or port of entry or commercial weigh and inspection stations instituted pursuant to other statutes. *See Sims*, 841 P.2d at 9.

12. This court first explicitly recognized an exclusionary rule as part of article I, section 14 in *Larocco*, 794 P.2d at 471–73. In writing for two

members of this court, Justice Durham stated that the "exclusion of illegally obtained evidence is a necessary consequence of police violations of article I, section 14." *Id.* at 472. This holding was affirmed by a majority of this court in *Thompson*, 810 P.2d at 416–18. This rule properly insures that article I, section 14's prohibition against unreasonable searches and seizures will adequately protect our citizens against illegal police conduct. Anything less would reduce this provision to nothing more than a form of words. *See, e.g., Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

RUSSON, Justice, dissenting:

¶ 37 I concur in Chief Justice Howe's dissenting opinion, and write separately to express my concern with the ambiguity of the holding of Justice Durham's opinion. Justice Durham correctly recognizes that at least one purpose of the checkpoint in the instant case—the vehicle equipment violations check—is overly broad. However, her opinion appears to conclude, without any justification, that vehicle checkpoints with multiple purposes are unconstitutional.

¶ 38 Neither this court nor the U.S. Supreme Court has recognized any constitutional limitations on the number of "checks" that a checkpoint plan may require. Rather, the magistrate examining the checkpoint plan, or the court reviewing the checkpoint plan after the fact, must determine whether each "check" is independently valid and, as explained by *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), whether the law enforcement officers are able to carry out each check in a manner that minimizes intrusion and delay. In fact, the Tenth Circuit has upheld a Utah checkpoint that included a list of purposes nearly identical to those in the instant case. *See United States v. Hernandez*, 1998 U.S.App. LEXIS 27610, at *4–*7 (10th Cir.) (unpublished opinion). The multi-purpose checkpoints in the instant case and in *Hernandez* both involved checks for vehicle equipment violations, but the vehicle equipment check in *Hernandez* was properly tailored to an "exterior examination of vehicles for the required lights, turn signals, and other exterior safety devices." *Id.* at *6. Thus, the problem with the checkpoint plan in the instant case is not that it listed several purposes, but that not all of its purposes were independently valid.

¶ 39 Justice STEWART and Justice ZIMMERMAN acted prior to their retirement.