STATE of Indiana, Appellant (Plaintiff Below),

v.

Jarrod E. GERSCHOFFER, Appellee (Defendant Below).

No. 71S05–0102–CR–106.

Supreme Court of Indiana.

March 5, 2002.

Karen M. Freeman–Wilson, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Mark A. Kopinski, South Bend, IN, Attorney for Appellee.

## ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

In this case the Court of Appeals interpreted Article 1, Section 11 of the Indiana Constitution to prohibit all sobriety checkpoints as unreasonable seizures. We disagree, but affirm suppression of the evidence obtained from the roadblock in this case because the procedures followed did not satisfy the requirements of Section 11, a part of Indiana's Bill of Rights.

## Facts and Procedural History

Late on the night of June 18, 1999, the Indiana State Police and the Mishawaka Police Department jointly conducted a sobriety checkpoint on McKinley Avenue, just west of its intersection with Grape Road, in Mishawaka. Jarrod Gerschoffer was one of seventy drivers pulled aside for observation. The officer who greeted Gerschoffer smelled alcohol and noted Gerschoffer's glassy, bloodshot eyes and slurred speech. Gerschoffer failed three sobriety field tests, and a subsequent chemical test showed that his blood alcohol content was 0.11.

This led the State to charge Gerschoffer with operating a vehicle while intoxicated (OWI), as a class D felony based on a previous OWI conviction.

Gerschoffer moved to suppress all evidence obtained from the checkpoint, claiming improper seizure under both the Fourth Amendment of the U.S. Constitution[1] and Article 1, Section 11 of the Indiana Constitution.[2] After a hearing, the trial court granted the motion, holding that although the checkpoint satisfied the Fourth Amendment, the failure to obtain a warrant was unreasonable under Article 1, Section 11.

The Court of Appeals affirmed, holding that "a sobriety checkpoint ... conducted absent probable cause or reasonable suspicion of illegal activity, constitutes an unreasonable seizure as proscribed by Article

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

2. Article 1, Section 11's wording is virtually identical: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

1, Section 11." *State v. Gerschoffer*, 738 N.E.2d 713, 726 (Ind.Ct.App.2000). We granted transfer to this Court, thus vacating that opinion. 753 N.E.2d 6 (Ind.2001).

## I. Federal Roadblock Jurisprudence: A Brief Refresher

■ We examine claims under the Indiana Constitution separately from those based on federal constitutional counterparts. *Ajabu v. State*, 693 N.E.2d 921 (Ind.1998); *see also Price v. State*, 622 N.E.2d 954 (Ind.1993). Nonetheless, both the U.S. Supreme Court and this Court have addressed the Fourth Amendment's applicability to sobriety checkpoints, and a review of federal holdings may inform our state analysis.

The U.S. Supreme Court first suggested that roadblocks might satisfy the Fourth Amendment when it held random and discretionary stops to check drivers' licenses and vehicle registrations unconstitutional in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979):

This holding does not preclude the ... States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.

*Id.* at 663, 99 S.Ct. 1391 (footnote omitted).

The same year, the Court identified three factors to weigh in assessing the constitutionality of seizures less intrusive than traditional arrests: (1) "the gravity of the public concerns served by the seizure,"

(2) "the degree to which the seizure advances the public interest," and (3) "the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (random stop-and-identify statute held unconstitutional). The Court went on to say that a central concern in balancing these factors is "assur[ing] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions at the unfettered discretion of officers in the field." *Id.* Therefore, "the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* (citing *Prouse*, 440 U.S. at 663, 99 S.Ct. 1391).

Seven years later, we applied these federal principles in a Fourth Amendment challenge to a roadblock designed to check for licenses and registrations as well as OWI. *State v. Garcia*, 500 N.E.2d 158, 159–61 (Ind.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987).[3] We held, three-to-two, that the OWI problem, including under-age drinking, was grave enough to justify nontraditional enforcement methods. *Id.* at 161. The arrest rate and the "obvious" deterrent effect sufficiently advanced the public interest. *Id.* at 162. The average stop was only two or three minutes, and many people turned around and avoided the roadblock after seeing it ahead, so the level of interference was acceptable. *Id.*

We also considered the degree of discretion involved. Based on a previously communicated plan, one officer flagged vehicles over in blocks of five as soon as the previous five were released. *See id.* at 160. An officer then asked each driver to produce a license or registration while

---

**3.** Garcia did not argue that the Indiana Constitution required suppression of the evidence.

*Id.* at 159.

checking for indications of OWI or under-age drinking. *See id.* at 161.

This uniformly followed procedure imposed sufficiently "explicit, neutral limitations" upon the individual officers to satisfy the Fourth Amendment. *Id.* at 162.

The U.S. Supreme Court took a similar approach and reached a similar conclusion in *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Sitz challenged a roadblock procedure developed by a committee appointed under the authority of the state police, comprised of representatives from state and local police forces, state prosecutors, and a university transportation research institute. *Id.* at 447, 110 S.Ct. 2481. Under the procedure, all vehicles were stopped at the checkpoint for an average of twenty-five seconds. *Id.* at 448, 110 S.Ct. 2481. Only if the checkpoint officer detected signs of intoxication would he or she ask for a license and registration. *Id.* at 447, 110 S.Ct. 2481.

Applying the *Brown* balancing test, the *Sitz* court held that brief, suspicionless seizures at highway checkpoints for the purpose of combating drunk driving do not violate the Fourth Amendment. *Id.* at 455, 110 S.Ct. 2481; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 34, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). It held, "No one can seriously dispute the magni-tude of the drunken driving problem or the States' interest in eradicating it," and found the degree of intrusion as measured by duration of the seizure and intensity of the questioning slight. *Sitz*, 496 U.S. at 451–52, 110 S.Ct. 2481 (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding border checkpoints to detect illegal aliens)).

The Court distinguished roving police patrols whose approach might frighten motorists, especially those traveling alone at night on remote roads, from checkpoints where drivers see others being similarly stopped. *Sitz*, 496 U.S. at 453, 110 S.Ct. 2481 (citing, inter alia, *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074). It also declared that nothing in *Brown* was intended to shift the choice between reasonable law enforcement techniques from politically accountable officials to the courts. *Id.*

The U.S. Supreme Court recently clarified federal constitutional limitations in *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), a successful Fourth Amendment challenge to a drug interdiction roadblock. The baseline rule is that a search or seizure is ordinarily unreasonable absent individualized suspicion of criminal activity.[4] *Edmond*, 531 U.S. at 37, 121 S.Ct. 447

---

**4.** The Court noted that suspicionless searches may be justified when special needs exceed normal law enforcement requirements. *Edmond*, 531 U.S. at 37, 121 S.Ct. 447 (citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)(upholding random drug testing of student athletes); *National Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding drug tests for U.S. Customs employees seeking transfer or promotion to certain positions); *Skinner v. Ry. Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding drug and alcohol tests for railway employ-ees involved in train accidents or found in violation of certain safety regulations)). Appropriately limited administrative searches may also be allowed even absent particularized suspicion. *Edmond*, 531 U.S. at 37, 121 S.Ct. 447 (citing *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (upholding warrantless site inspection of "closely regulated" business); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (upholding inspection of damaged premises to establish cause of fire); *Camara v. Mun. Court of City & County of S.F.*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (upholding city housing code inspections)).

(citing *Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)). The Court acknowledged that checkpoints sometimes pass constitutional muster even though they are not based on individualized suspicion but distinguished its prior holdings in *Martinez–Fuerte, Sitz,* and *Prouse* by saying, "In none of these cases ... did [the Court] indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond,* 531 U.S. at 38, 121 S.Ct. 447.

The key distinction between *Sitz* and *Edmond* is that sobriety checkpoints are "designed primarily to serve purposes closely related to ... the necessity of ensuring roadway safety." *Edmond,* 531 U.S. at 41, 121 S.Ct. 447. Narcotics checkpoints, on the other hand, are not similarly directed at "immediate, vehicle-bound threat[s] to life and limb." *Id.* at 43, 121 S.Ct. 447.

## II. Section 11 and OWI Roadblocks: General Principles

■ The Indiana Constitution has unique vitality, even where its words parallel federal language.[5] We resolve Indiana constitutional claims by "examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Ind. Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 298 (Ind.1994) (citing *State Election Bd. v. Bayh,* 521 N.E.2d 1313 (Ind.1988)).

Indiana's founders left few clues about the formulation of Article 1, Section 11. The 1816 constitutional convention adopted this section in remarkably short order with no recorded debate, in nearly the same words we have today.[6] Moreover, historical context offers only limited insight on the issue of roadblocks because "[t]he automobile has made an alteration in our way of life unforeseen and unforeseeable by the Founding Fathers." *Williams v. State,* 261 Ind. 547, 553, 307 N.E.2d 457, 461 (1974).

■ This is not to say that we are writing on a blank slate. We have previously held that Article 1, Section 11 must be liberally construed to protect Hoosiers from unreasonable police activity in private areas of their lives. *Brown v. State,* 653 N.E.2d 77 (Ind.1995) (warrantless search of defendant's car held unreasonable under Indiana Constitution). Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims, we place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. *Baldwin v. Reagan,* 715 N.E.2d 332, 337 (Ind.1999) (citing *Brown,* 653 N.E.2d at 79–80).

In *Brown,* we acknowledged the tension between multiple constitutional objectives. "[I]t may safely be said that Hoosiers re-

---

**5.** "Even where an Indiana constitutional provision is substantially textually coextensive with that from another jurisdiction ... we may part company with the interpretation of the Supreme Court of the United States or any other courts based on the text, history, and decisional law elaborating the Indiana constitutional right." *Ajabu,* 693 N.E.2d at 929 (citations omitted).

**6.** The *Journal of the Convention of the Indiana Territory, 1816, reprinted in* 61 Ind. Mag. Hist.

77, 81 (1965), reports that the delegates convened on Monday, June 10. On Wednesday, June 12, they appointed a dozen drafting committees, including a committee to prepare and report a preamble and bill of rights. *Id.* at 82, 97. This committee delivered its report on Friday, June 14. *Id.* at 106, 111. On June 27, Article 1, Section 11 was adopted on third reading in essentially its current form, without recorded debate. *Id.* at 122–23, 134–35, 149.

gard their automobiles as private and cannot easily abide their uninvited intrusion." *Brown*, 653 N.E.2d at 80. On the other hand, "Indiana citizens have been concerned not only with personal privacy but also with safety, security, and protection from crime." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind.2001).

We note the existence of some evidence that sobriety checkpoints can be effective. A 1999 study concluded that an extensively publicized, statewide checkpoint program in Tennessee reduced alcohol-related crashes by more than twenty percent, the equivalent of nine fatal accidents per month. John H. Lacey et al., *Evaluation of Checkpoint Tennessee: Tennessee's Statewide Sobriety Checkpoint Program*, Technical Report Prepared for U.S. Department of Transportation, National Highway Traffic Safety Administration (Jan.1999), *at* http://www.nhtsa.dot.gov/people/injury/research/ChekTenn/ChkptTN.html.

In the instant case, the Court of Appeals said, "A suspicionless roadblock seizure is inherently random, arbitrary and capricious, and there is nothing in the text or original meaning of Article 1, Section 11 to suggest that the framers would have considered such a seizure as anything other than unreasonable." *Gerschoffer*, 738 N.E.2d at 723–24. We have concluded otherwise.

■ A minimally intrusive roadblock designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation is constitutionally reasonable, unlike the random and purely discretionary stops we have disapproved. *See Baldwin v. Reagan*, 715 N.E.2d at 337 (requiring individualized suspicion of a seat belt law violation before stopping a motorist). As Professor Akhil Reed Amar has said, "A broader search is sometimes better—fairer, more regular, more constitutionally reasonable—if it reduces the opportunities for official arbitrariness, discretion, and discrimination.... The broader, more even-handed search is sometimes more constitutionally reasonable even if the probabilities are lower for each citizen searched." Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L.Rev. 757, 809 (1994) (arguing for a shift from traditional federal search and seizure jurisprudence to an approach that focuses on constitutional reasonableness).

■ We therefore join those jurisdictions rejecting the contention that all roadblocks are per se violations of state constitutional requirements.[7] The question then becomes whether this particular roadblock was conducted in a constitutionally reasonable manner.

### III. Reasonableness of This Roadblock

States that have held, as we do today, that sobriety checkpoints do not violate their state constitutions per se have focused on reviewing the implementation of specific roadblocks. *See* R. Marc Kantrowitz, Annotation, *Validity of Police*

---

7. *See, e.g., People v. Rister*, 803 P.2d 483 (Colo.1990); *State v. Boisvert*, 40 Conn.App. 420, 671 A.2d 834 (1996), *cert. denied*, 237 Conn. 903, 674 A.2d 1332 (1996); *Commonwealth v. Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985); *Commonwealth v. Yastrop*, 564 Pa. 338, 768 A.2d 318 (2001); *State v. Downey*, 945 S.W.2d 102 (Tenn.1997); *State v. DeBooy*, 996 P.2d 546 (Utah 2000); *State v. Record*, 150 Vt. 84, 548 A.2d 422 (1988). A number of other states have upheld sobriety checkpoints by applying a more parallel Fourth Amendment and state constitutional analysis. *See, e.g., Brent v. State*, 270 Ga. 160, 510 S.E.2d 14 (1998); *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983); *State v. Jackson*, 764 So.2d 64 (La.2000); *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986).

*Roadblocks or Checkpoints for Purpose of Discovery of Alcoholic Intoxication—Post–Sitz Cases,* 74 A.L.R. 5th 319, § 2a (2001). These states have identified a variety of factors pertinent to assessing the constitutionality of specific checkpoints.[8] *Id.* We review the Mishawaka roadblock in light of some factors we consider significant.

*Neutral Plan Approved by Appropriate Officials.* Some states have looked more favorably upon roadblocks staged pursuant to formal guidelines adopted at an appropriate policy-making level. For example, in *Boisvert,* 671 A.2d at 837, a Connecticut court noted with approval that the roadblock complied with state police guidelines promulgated by the public safety commissioner. These guidelines required, among other things, advance approval by ranking officers; a careful choice of location, date and time "after considering many factors, including the safety of the public and those conducting the operation and the potential inconvenience to the public"; advance publicity; and assurance to drivers that the stop was routine. *Id.; see also Trumble,* 396 Mass. 81, 483 N.E.2d 1102 (roadblock that complied with state police guidelines was a reasonable seizure).

■ We agree that a properly approved, neutral plan would help support the reasonableness of the sobriety checkpoint. Here, Sergeant Gary Coffie, the officer in charge for the State Police, testified that he followed written federal and state police guidelines. (R. at 85–86, 100–01.) Those guidelines are not part of the record, however, so we cannot assess their efficacy.

■ *Objective, Location and Timing.* "A seizure is not reasonable unless it is well calculated to effectuate its purpose." *Garcia,* 500 N.E.2d at 167 (Shepard, J., dissenting). Here, the connection between the vehicular threat of OWI and the objectives, location and timing of the roadblock is tenuous at best.

A press release indicated that this checkpoint was intended to catch drunk drivers, seat belt and child restraint violations, and "other violations." (R. at 181.) Corporal Timothy Williams, the officer in charge for the Mishawaka Police Department, indicated that the site selection was intended to reduce speeding and "cruising." (R. at 146.) He said, "[I]t's a good way to kind of slow traffic down, make sure everybody is doing what they're supposed to." (*Id.*)

Williams also said that another goal was "[t]o make sure . . . everybody's got all the

---

8. One good example is *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987), where the Pennsylvania Supreme Court said:

[T]he conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of the roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.
*Id.* at 1043.

proper information with them," including "[l]icense, registration, insurance information." (R. at 146.) The Vermont Supreme Court once noted, and we agree, that "[t]he thought that an American can be compelled to 'show his papers' before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals." *Record,* 548 A.2d at 426 (quoting *State v. Kirk,* 202 N.J.Super. 28, 493 A.2d 1271, 1285 (App.Div.1985)).

Here, the State has offered a montage of objectives, including the generic law enforcement goal of "mak[ing] sure everybody is doing what they're supposed to." (R. at 146.) This sounds more like a generalized dragnet than a minimally intrusive, neutral effort to remove impaired drivers from the roadways before they hurt someone.

The evening's statistics reinforce this conclusion. Seventy stops produced fourteen traffic arrests and thirty-four warnings. (R. at 177.) Only two citations were for OWI.[9] (*Id.*)

The location's selection casts further doubt on whether this roadblock was sufficiently related to the public danger of drunk driving. The officers in charge sensibly chose a well-lighted, reasonably busy area that was amenable to traffic control. (R. at 145–46.) They chose this particular site partially because they had conducted a checkpoint in the same location the previous winter and wanted to compare results. (R. at 136.)

When asked the reasons for the site selection, however, neither officer indicated that drunk driving had been a particular problem at this location. (R. at 103–04, 145–46.) Corporal Williams said only that

a high volume of general traffic violations occurred in the area. (R. at 145–46.)

The officers operated the roadblock from 11:30 p.m. until 1:30 a.m. because "traffic is easier to handle; it's not exactly that we were going to get a lot of [OWI] arrests." (R. at 107–08.) Also, businesses were closed at that hour and shoppers were no longer out, but it was still early enough for a "substantial amount of traffic." (R. at 108.) Finally, the timing was convenient based upon officer shift changes. (*Id.*) As with location, the State did not link the timing to the danger being addressed.

■ To be constitutionally reasonable, the location and timing of sobriety checkpoints should take into account police officer safety, public safety, and public convenience. The roadblock should also effectively target the public danger of impaired driving. Here, the State did not offer any evidence of objective considerations such as an unusually high rate of OWI-related accidents or arrests in the chosen area. The State has therefore not shown that this roadblock was sufficiently related to the legitimate law enforcement purpose of combating drunk driving.

■ *Police Discretion.* Many states consider the degree of discretion exercised by field officers conducting the roadblock a critical factor. *See, e.g., Downey,* 945 S.W.2d at 111–12 (requiring that Tennessee roadblocks be "established and operated in accordance with predetermined guidelines and supervisory authority that minimize the risk of arbitrary intrusions on individuals and limit the discretion of

---

**9.** The statistical summary breaks this number down as one "9–30–5–2 (OWI)" and one "9–30–5–3 (PRIOR)." (R. at 177–78.) Gerschoffer was charged under both of these statutes, so it is unclear whether anyone other than Gerschoffer was arrested for OWI during the roadblock.

law enforcement officers at the scene"). We agree.

Here, Sergeant Coffie flagged in five vehicles at a time, then allowed other traffic to flow through. (R. at 90–91.) As soon as all five vehicles were cleared, Coffie flagged in five more, without regard to vehicle type. (R. at 91, 122–24.) This procedure satisfied the Fourth Amendment in *Garcia*, 500 N.E.2d at 161, and it seems a reasonably neutral and consistent method.

Other procedures, however, were not as carefully controlled. Aside from being told to be "professional and courteous," officers received no specific directive on how to approach and screen motorists. (R. at 115, 150.) Each individual officer was therefore allowed to decide whether to immediately request license, registration, and/or insurance information from all drivers or only from some of them based on an appearance of impairment or other grounds. (R. at 119, 136, 150.) No standardized instructions were given to ensure that officers addressed drivers in a consistent manner.[10] (R. at 119–20.) Furthermore, each officer had the discretion to decide how many and what type of sobriety tests to perform if he or she detected alcohol. (R. at 96, 150.)

The State has therefore not shown that it provided sufficiently explicit guidance to ensure against arbitrary or inconsistent actions by the screening officers. This very important factor weighs against the reasonableness of the roadblock.

*Degree of Intrusion.* If the officer approaching a car did not detect any violations, the length of detention averaged four minutes. (R. at 130.) In *Garcia*, stops approximating two to three minutes satisfied the Fourth Amendment. 500 N.E.2d at 162. In *Sitz*, the average detention period was only twenty-five seconds. 496 U.S. at 448, 110 S.Ct. 2481.

The reasonableness of this detention period is questionable. Four minutes could certainly seem like a very long time to a law-abiding citizen pulled off the road for observation and questioning by the police. In light of other similar cases where the intrusion has been much briefer, it is not clear that a well-trained officer needs this much time to assess driver sobriety. *See id.; see also Trumble*, 483 N.E.2d at 1105.

■■■ In evaluating the degree of intrusion, we also consider whether the roadblock was avoidable. The more avoidable a roadblock is, the less it interferes with the liberty of individual drivers. A roadblock need hardly be altogether voluntary, however, or it would have little enforcement or deterrent value.

Because the checkpoint was near an intersection and only cars coming from the direction of the intersection were stopped, drivers could have theoretically turned and

---

10. Sergeant Coffie testified:

Q: . . . So you didn't go through any specific conversation they had to have, an actual step-by-step of what they needed to do as they approached the car, right?

A: No, not step-by-step. There's too many variables as far as what an officer would observe from the occupant of that vehicle.

Q: And . . . whether or not they asked to see your license and registration first or whether or not they asked if they had been drinking was basically up to the officer?

A: Basically, it's up to the officer . . .

(R. at 119.) *Compare to Trumble*, 483 N.E.2d at 1104–05, where troopers were instructed to say "Good evening, how are you, this is a State Police Sobriety checkpoint, we would like you to have a copy of the brochure on drunk driving laws." *Id.* at 1105. While handing over the brochure, the trooper could observe the driver and the interior of the vehicle. *Id.* If no problems appeared, the trooper was to say "thank you" and allow the vehicle to proceed, for an actual stopping time of about thirty seconds. *Id.*

avoided the checkpoint. (R. at 184.) Sergeant Coffie testified, however, that a six-by-five-foot sign announcing the sobriety checkpoint was illuminated only "when headlights hit it." (R. at 112.) The sign was propped against a squad car that blocked the left lane where the checkpoint began, so as to channel cars into single file in the right lane. (R. at 111–13, 184.)

Sergeant Coffie conceded that because the only signage was past the roadblock's entry point, approaching drivers may not have realized the activity ahead (red lights and flares) was a checkpoint until the point of no return, especially if larger vehicles blocked their view. (R. at 113–14.) The lack of demonstrated avoidability therefore weighs slightly against the State.[11]

*Safe Conditions.* The State offered testimony that the checkpoint was located in a well-lighted area, where vehicles could be pulled off the roadway into an adjacent parking lot without impeding traffic. This weighs in favor of constitutionality.

*Effectiveness.* The officers stopped seventy of the 198 cars funneled through the checkpoint. (R. at 127.) Fourteen arrests resulted, of which two were for OWI.[12] (R. at 129.) This seems a fairly low percentage, especially considering that officers administered a dozen preliminary breath tests.[13] (R. at 178.) Both Sergeant Coffie and Corporal Williams conceded that roving patrols produce more OWI arrests than do roadblocks. (R. at 105, 148.)

Apprehension rates are not, however, the end of the question. As Tennessee's experience proves, roadblocks can effectively deter OWI, such that even a modest arrest rate may simply reflect the fact that advance publicity scared those who would drink and drive off the roads. *See Lowe,* 337 S.E.2d at 277 ("[T]he deterrent effect ... is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested.").[14]

Here, however, we have no evidence from which to infer that the low apprehension rate was the effect of a successful media blitz. Sergeant Coffie sent a press release to four television stations two days before the checkpoint date, (R. at 94–95), but sent nothing to radio stations, local newspapers, or other print media, (R. at 106–07). No one ever determined whether the pending roadblock was actually reported by the four stations notified. (R. at 107.)

Law enforcement agencies cannot control what the media chooses to report, of course, and may not have funds to pay for

---

**11.** *Compare to* "Marion County Traffic Safety Partnership Multi–Agency Sobriety Checkpoint Procedures," filed as an Appendix to the Amici Curiae brief of Bart Peterson, Jerry Barker, Jack Cottey and Scott Newman in Support of State's Petition to Transfer. The Marion County plan calls for a physical layout similar to Mishawaka's, except that the checkpoint sign is on the opposite side of the intersection, so that approaching motorists may turn off before reaching the checkpoint. (Amici Curiae App. at 7–8.) Marion County's written procedures state:

> *Avoiding the Checkpoint*
> A motorist who wishes to avoid the sobriety checkpoint site by legally turning before entering the checkpoint area shall be allowed to do so unless the driver engages in any unlawful, unusual or dangerous behavior. The act of avoiding a sobriety checkpoint does not constitute the grounds for a stop.

(*Id.* at 9.)

**12.** Or, possibly, only one. *See supra* note 9.

**13.** Four of these preliminary tests registered no alcohol at all; three more registered only .01 or .02. (R. at 178.)

**14.** The converse is also true, of course: the end does not justify the means, and a high capture rate will not save a constitutionally unreasonable roadblock.

publicity. Here, however, some major news sources received no notification at all, and we do not know if television stations carried stories on the planned roadblocks. We cannot infer, absent any proven publicity, that this checkpoint effectively deterred potential offenders.[15]

■ *Summary.* In light of the above factors, with particular emphasis on the high level of officer discretion and the very weak link between the public danger posed by OWI and the objectives, location and timing of the checkpoint, the State did not meet its burden to show that this roadblock was constitutionally reasonable under Article 1, Section 11. The trial court therefore correctly suppressed the fruit of this seizure.

### Conclusion

We affirm the trial court's ruling granting the motion to suppress.

SULLIVAN, BOEHM, and RUCKER, JJ., concur.

DICKSON, J., concurs and dissents with separate opinion.

DICKSON, Justice, concurring in part and dissenting in part:

I join Part I and, except as noted below, Part II of the majority opinion. I respectfully dissent, however, to Part III, believing that the particular roadblock challenged here was not unreasonable in the totality of the circumstances.

Quoting from the dissenting opinion in *State v. Garcia,* 500 N.E.2d 158, 167 (Ind.1986)(Shepard, J., dissenting), the majority declares: "A seizure is not reasonable unless it is well calculated to effectuate its purpose." Maj. op. at 967. And near the close of Part II, the majority asserts that one of the proper considerations in determining the constitutional reasonableness of a roadblock is whether it "effectively targets a serious danger specific to vehicular operation." Maj. op. at 966. Later, in Part III, the majority proceeds to consider effectiveness when evaluating this roadblock. Maj. op. at 970–71. Whether a roadblock is "well calculated" to be efficacious is not, in my opinion, a significant factor to be considered in the determination of roadblock reasonableness.[1]

Finally, I do not share the majority's critical view of the Mishawaka roadblock's objective, location, and timing; the lack of compelled uniformity regarding the officers' approaching and screening of motorists; the lack of sufficient avoidability; and the lack of sufficient effectiveness. Notwithstanding the possible excessive average length of detention, I believe that the record establishes that the roadblock was not unreasonable in the totality of the circumstances. In my judgment, the trial court erred in granting the motion to suppress.

---

**15.** Advance publicity serves a secondary purpose as well. The degree of intrusion is less when motorists receive advance warning of potential stops and are not taken by surprise.

**1.** Efficacy is particularly problematic when evaluating police sobriety roadblocks because advance public knowledge may significantly foster responsible alcohol consumption, and thus yield significantly fewer arrests. This deterrent effect cannot be measured and can only be estimated by speculation. Yet it is

clearly one of the objectives of law enforcement and, if efficacy is considered, actual deterrence must be included in the determination. On the other hand, extensive advance publicity may motive drivers to take alternate routes rather than to diminish consumption of alcohol. Efficacy is simply an unreliable and immaterial consideration in determining whether a roadblock is unreasonable under the Indiana Constitution.