2003 UT 20

**State of UTAH, Plaintiff and Appellee,**

v.

**Robert Nate ABELL, Defendant and Appellant.**

**No. 20001092.**

Supreme Court of Utah.

May 9, 2003.

agreement are not according to ordinary business terms." *In re Meridith Hoffman Partners,* 12 F.3d at 1553.

Mark L. Shurtleff, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Salt Lake City, for plaintiff.

J. Bryan Jackson, Cedar City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 In this case, the defendant appeals the denial of his motion to suppress evidence obtained during an administrative vehicle checkpoint detention. Based on our ruling in *State v. DeBooy*, 2000 UT 32, 996 P.2d 546, the defendant argues that this checkpoint was unconstitutional under article I, section 14 of the Utah Constitution. We agree and reverse the denial of his motion to suppress.

## BACKGROUND

¶ 2 On February 29, 2000, Judge Kent Nielsen approved the Utah Highway Patrol's ("UHP") application to conduct an administrative highway checkpoint the following day between 7 a.m. and 7 p.m., on Interstate 70, about four miles west of Salina, Utah. The application was submitted pursuant to Utah Code Ann. § 77–23–104 (1999), which requires judicial approval of a written plan prior to the operation of a checkpoint. Under section 77–23–104, the plan must include several details relating to the operation of the checkpoint, including the purpose for establishing the checkpoint. Utah Code Ann. section 77–23–104(2)(a)(iv). The checkpoint plan authorized eleven independent checks among seven stated purposes: [1]

A. To promote a safe public environment for all persons using the state highways.

B. To inspect compliance with seat belt and child restraint requirements.

C. To determine if drivers are impaired.

D. To detect minors having in their possession alcohol or controlled substances.

E. To conduct exterior examination of vehicles for the required lights, turn sig-

---

1. Within the seven stated purposes, eleven checks were authorized. These include: (1) to inspect compliance with seat belt requirements; (2) to inspect compliance with child restraint requirements; (3) to determine if drivers are impaired; (4) to detect minors in possession of alcohol; (5) to detect minors in possession of controlled substances; (6) to conduct exterior examination of vehicles for required lights, turn signals, and other exterior required safety devices; (7) to conduct inspections of commercial vehicles; (8) to inspect validity of license plates; (9) to inspect validity of registration certificates; (10) to determine compliance with insurance requirements; and (11) to inspect driver licenses.

nals, and other exterior required safety devices.

F. To conduct routine level three inspections of commercial vehicles over 26,001 pounds GVW.

G. To inspect the validity of license plates, registration certificates, proof of insurance and driver licenses.

*See* Application and Authorization for Administration Traffic Checkpoint, IV.

¶ 3 While the application authorized multiple checks, the portion of the checkpoint plan providing instructions to officers conducting the checkpoint indicated that this was a "driver license and registration check":

This administrative checkpoint is a driver license and registration check and is to detect and apprehend individuals suspected of violating the following regularly enforced state laws: driver license violations; registration violations; proof of insurance violations; equipment violations; safety inspection violations; alcohol and DUI violations.

*Id.* at VII(H).

¶ 4 The instructions also briefly mentioned how officers would conduct their inquiries at this driver license checkpoint:

Officers will be instructed to request a drivers license, state vehicle registration certificate and valid proof of insurance. Officers will be directed to make a cursory walk around the vehicle inspecting for plain view evidence of the above listed violations.

*Id.*

¶ 5 Under the section of the application dealing with the sequence of traffic to be stopped, the application stated that the inspection and inquiry of non-commercial vehicles were "estimated to require approximately 30 seconds duration." *Id.* at III. Inspections of commercial vehicles were estimated to last approximately a minute and a half. *Id.* These time constraints were not listed among the instructions provided to the officers in the application, however. Rather, the instructions section of the checkpoint plan indicated "citizens will not be delayed longer than is reasonable" to check for all of the violations.

¶ 6 Some details concerning the organization of the checkpoint staging area were also included in the checkpoint plan. *Id.* Large diamond-shaped orange warning signs were to be placed "1500, 1000, and 500 feet prior to the checkpoint." *Id.* at V(B)(4). The signs preceding the checkpoint alerted drivers to "Road Work Ahead" and "Right Lane Closed Ahead," but did not mention the presence of a highway checkpoint.

¶ 7 The application also included a list of the agencies involved in the checkpoint, the name of the officer in charge, the minimum number of officers involved (six), and listed equipment to be present at the checkpoint, including signs, cones, barrels, police vehicles and emergency lights, a breath alcohol testing unit, and the traffic control signs. Two drug sniffing dogs accompanied by UHP K–9 troopers were also present at the checkpoint.

¶ 8 The appellant, Robert Abell ("Abell"), is an adult resident of Colorado. On March 1, Abell and a passenger were driving a vehicle with Colorado license plates on Interstate 70 when, after passing the "road work ahead" signs, UHP K–9 trooper Jeff Chugg (Trooper Chugg) directed them toward the checkpoint area. Trooper Chugg observed that neither Abell nor his passenger were wearing seatbelts. He also noticed that the windows were rolled down. The trooper motioned for the vehicle to stop at the checkpoint. Once stopped, Trooper Chugg asked Abell for identification, registration, and insurance information. Abell handed the trooper a vehicle rental agreement, showing that the vehicle was overdue and that Utah was not an area in which the vehicle was authorized to be. As the trooper talked with Abell, the trooper allegedly smelled the odor of burnt marijuana in the vehicle. Trooper Chugg also testified that Abell appeared "very nervous" and had a "quiver in his voice." The trooper also noted that Abell was wearing only a small vinyl or leather vest, despite the cool March weather.

¶ 9 The UHP trooper returned to his own vehicle to issue a citation for the seatbelt violation. As he did so, another officer reported that a semi-truck driver, stopped behind Abell at the checkpoint, wanted to sign a complaint against Abell for speeding and driving in a reckless manner. While the

trooper was completing the seatbelt citation, another officer, UHP K–9 trooper Ryan Bauer, asked Abell for permission to search his vehicle. Abell refused.

¶ 10 Upon completing the citation and returning to the vehicle, the trooper asked Abell to submit to several field sobriety tests. Abell complied. Based on the tests, Trooper Chugg concluded that Abell was driving under the influence of a central nervous system stimulant.

¶ 11 Meanwhile, Abell's passenger had consented to a search of his baggage. Accordingly, two officers opened the trunk, removed the passenger's baggage, and deployed a drug sniffing dog, who alerted to the presence of narcotics inside the vehicle. A second police dog alerted to both the interior of the vehicle and the open trunk. At this point, Abell told the officers where they would find a small amount of marijuana in the vehicle. Ultimately, the officers found approximately 10 grams of marijuana, less than two grams of cocaine, and items of drug paraphernalia in Abell's vehicle.

¶ 12 Abell was taken into custody and charged with possession of cocaine, possession of marijuana, possession of drug paraphernalia, driving without a seatbelt, driving under the influence of drugs or alcohol, and speeding. Abell submitted a motion to suppress the evidence obtained from the search at the highway checkpoint, but the trial court denied the motion. The trial court reasoned that the checkpoint was conducted within the parameters set out in *State v. DeBooy*, 2000 UT 32, 996 P.2d 546, this court's prior ruling on the constitutionality of multi-purpose vehicle checkpoints. Abell then entered a conditional plea of guilty on all counts, subject to the condition that he could appeal the denial of the motion to suppress.

¶ 13 On appeal, Abell advances four arguments to support his motion to suppress. First, he argues that the application for the checkpoint was too broad to be valid under section 77–23–104 and this court's decision in *DeBooy* because it listed multiple purposes for the checkpoint and gave officers excessive discretion to ·conduct the checks. Second, Abell argues that the search of his vehicle, which included the use of drug sniffing dogs,

was beyond the stated purposes of the administrative plan and that the entire checkpoint was merely a pretext to look for drugs. Third, Abell argues that the checkpoint plan was not neutrally administered, but focused specifically on out-of-state vehicles. Finally, he argues that because the search was unlawful, the evidence obtained constitutes "fruit of the poisonous tree" and should be suppressed.

¶ 14 We agree that the checkpoint plan was conducted beyond the boundaries of section 77–23–104 and was not in compliance with our decision in *DeBooy*.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 15 The trial court's denial of Abell's motion to suppress was premised on the legality of the checkpoint in question. This is a conclusion of law which we review for correctness, granting no deference to the conclusions of the trial court. *DeBooy*, 2000 UT 32 at ¶ 7, 996 P.2d 546.

### II. CONSTITUTIONALITY OF VEHICLE CHECKPOINTS

¶ 16 Persons stopped at checkpoints have been "seized" for the purposes of analysis under article I, section 14 of the Utah Constitution and the Fourth Amendment to the United States Constitution. *DeBooy*, 2000 UT 32, 996 P.2d 546; *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). We have noted previously that both the Utah constitution and the federal Constitution prohibit "sweeping, dragnet-type detentions of ordinary people engaged in peaceful, ordinary activities." *DeBooy*, 2000 UT 32 at ¶ 13, 996 P.2d 546. Rather, " '[s]pecific and articulable facts ... taken together with rational inferences from those facts [must] reasonably warrant' the particular intrusion." *Id.* at ¶ 13 (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Under both federal and Utah law, however, administrative highway checkpoints are permitted as a narrow exception to the reasonable suspicion requirement—allowing the

state to detain vehicles to conduct brief, limited inquiries that advance important public interests related to the use and safety of the highways. Utah Code Ann. § 77–23–104 (1999); *DeBooy*, 2000 UT 32 at ¶ 31; *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 449, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Martinez–Fuerte*, 428 U.S. at 561–62, 96 S.Ct. 3074.

¶ 17 Because vehicle checkpoints implicate the protections of both the Fourth Amendment and article I, section 14 of the Utah Constitution, we necessarily begin our analysis with those provisions. While the state and federal laws contain identical language,[2] we have not always interpreted Utah's provisions in the same way that federal courts have construed the federal language. *DeBooy*, 2000 UT 32 at ¶ 12. Indeed, in *DeBooy* we examined federal checkpoint cases decided under the Fourth Amendment, but ultimately struck down the checkpoint on independent state constitutional grounds. *DeBooy*, 2000 UT 32 at ¶ 31, n. 7, 996 P.2d 546. The opinion we issue today is also based on state constitutional grounds. Nevertheless, in light of recent developments in United States Supreme Court case law, we will review the federal checkpoint cases solely for their persuasive value, before reviewing our decision in *DeBooy* and turning to the specific challenges presented in this appeal.

### A. Federal Analysis of Checkpoint Constitutionality

¶ 18 In evaluating the constitutionality of highway checkpoints, the United States Supreme Court has employed a balancing test that weighs "the degree to which the seizure [at the checkpoint] advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Critical to the Court's decision-making has been the "assur[ance] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (holding unconstitutional a roving police patrol authorized to stop any vehicle to check for driver licenses without any particularized suspicion)).

¶ 19 The Supreme Court has upheld checkpoints as reasonable intrusions on privacy in cases where the public interest was compelling and related to the use of the highways. In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116, the Court upheld the constitutionality of a highway checkpoint located more than fifty miles away from the Mexican border that was used to detect the presence of illegal immigrants. In *Sitz*, 496 U.S. at 447, 110 S.Ct. 2481, the Court upheld the constitutionality of a sobriety checkpoint that required a brief detention and examination of drivers for signs of intoxication. *Id.* at 447, 110 S.Ct. 2481. In both instances, the Court held that the checkpoints did not violate the Fourth Amendment because they involved minimally intrusive regularized stops, employed standardized procedures that limited the discretion of individual officers, minimized the 'fear and surprise' to motorists, and advanced purposes closely related to the use of the highways. *Martinez–Fuerte*, 428 U.S. at 559–62, 96 S.Ct. 3074; *Sitz*, 496 U.S. at 452–55, 110 S.Ct. 2481. In neither case was there any allegation that the checkpoints were being used to advance interests other than border control and preventing drunk driving, both state concerns of critical importance.

---

**2.** Article I, section 14 of the Utah Constitution states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Utah Const. art. I, § 14.

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

¶ 20 More recently, however, the Supreme Court held that individualized suspicion is required where the primary purpose of a vehicle checkpoint is simply to advance general law-enforcement goals, such as narcotics detection. In *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Court struck down Indianapolis' "drug checkpoint" program that was specifically designed to promote the interdiction of narcotics. *Id.* at 40, 121 S.Ct. 447. The program required drivers to stop at a designated drug checkpoint and produce a license and registration. *Id.* at 35, 121 S.Ct. 447. Officers then conducted a brief examination of the driver for signs of impairment and conducted exterior examinations of vehicles for plain-view violations. *Id.* A trained narcotics dog was also walked around the outside of each vehicle to detect the presence of drugs. *Id.*

¶ 21 In holding that the narcotics-detection checkpoints violated the Fourth Amendment, the Court rejected the city's argument that vehicle checkpoints are a lawful means of promoting general crime control. While the Court had previously upheld checkpoints when they advanced purposes related to the use and safety of the highways, the *Edmond* Court did not consider drug interdiction to be any more closely related to highway use than other kinds of criminal investigations. *Id.* at 41, 121 S.Ct. 447. Therefore, the Court "would not credit the 'general interest in crime control'" as justification for suspicionless stops. *Id.* (citing *Prouse*, 440 U.S. at 659, n. 18, 99 S.Ct. 1391).

¶ 22 In order to distinguish lawful and unlawful checkpoints, the Court adopted a "primary purpose" test. If the primary purpose of the checkpoint is only to advance general law enforcement—rather than goals specifically related to highway use and safety—the checkpoints will not pass constitu-

tional muster in the absence of individualized suspicion. *Id.* The Court noted:

> We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

*Id.* at 44, 121 S.Ct. 447.

¶ 23 Employing this analysis, the Court distinguished *Martinez–Fuerte* and *Sitz* on the grounds that those checkpoints advanced interests that were "closely related" to issues of highway use and safety (border control and drunk driving), whereas the primary purpose of the Indianapolis program was merely "to detect evidence of ordinary criminal wrongdoing." *Id.* at 41, 121 S.Ct. 447. "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control," the Court noted, "the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42, 121 S.Ct. 447.

### B. State v. DeBooy

¶ 24 *Edmond* and the Supreme Court's other checkpoint cases are helpful in delineating the scope of permissible and impermissible vehicle checkpoints. We note, however, that the *Edmond* Court refrained from addressing the issue we decided in DeBooy. In *Edmond*, because it was agreed that the checkpoints were designed to promote narcotics detection (an impermissible purpose),[3] the Court did not have to determine whether the State is allowed to establish checkpoints for an ostensibly lawful purpose (i.e., drivers license and sobriety checks) but then use those checkpoints to advance general law

---

**3.** In *Edmond*, the city argued that the checkpoint program was "justified by its lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations." *Id.* at 46, 121 S.Ct. 447. The Court rejected this argument because allowing such secondary purposes to validate an objectionable primary purpose would permit "law enforcement authorities ... to establish checkpoints for virtually any pur-

pose so long as they also included a license or sobriety check." *Id.* Thus, the Court resorted to a primary purpose analysis as a means of ensuring that "a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar." *Id.* at 47, 121 S.Ct. 447.

enforcement goals.[4] While the Supreme Court has left that question for another day, this court in *DeBooy* ruled that such pretextual checkpoint stops are impermissible under article I, section 14 of the Utah Constitution. 2000 UT 32 at ¶ 31. In DeBooy, we emphasized that the only purposes checkpoints are permitted to advance are those directly related to highway safety. "Magistrate authorization of checkpoints must be narrowly tailored and limited to inquiries directly linked to the safe use of the highways.... Multi-purpose, general warrant like intrusions on the privacy of persons using the highways are unacceptable." *Id.*

¶ 25 In *DeBooy*, the defendant was charged with possession of contraband after drugs were discovered during a consensual search of his vehicle at a highway checkpoint. The checkpoint at issue was, as here, a multiple purpose vehicle checkpoint where officers were authorized to conduct a half-dozen independent checks.[5] 2000 UT 32 at ¶ 31, n. 7. In our decision reversing the denial of DeBooy's motion to suppress, we held that such multiple purpose checkpoints were unacceptable under the Utah Constitution. We noted that multiple purpose checkpoints are "far more intrusive than the checkpoints at issue in *Martinez–Fuerte* and *Sitz*." *Id.* at ¶ 20. Drivers—in those instances—were briefly detained for only one purpose-either to check for illegal immigrants or drunk drivers. At the checkpoint in *DeBooy*, as here,

> the police conducted sweeping inspections of license plates, registration certificates, insurance certificates, driver's licenses, seat belt use, compliance with child restraint laws, vehicle equipment violations, and compliance with commercial vehicle regulations, in addition to checking for

drivers under the influence of alcohol or other substances, as well as other alcohol or controlled substance violations.

*Id.* at ¶ 21.

¶ 26 We found the intrusive nature of such extensive checkpoint inspections particularly troubling for two reasons. First, we noted that "when many legal violations are searched for, the purpose of the checkpoint becomes less a highway safety measure, and more a pretext to stop all vehicles to search for any and all violations of the law." *Id.* at ¶ 22.

¶ 27 The second major concern with multiple purpose checkpoints noted in *DeBooy* was the lack of limits on officer discretion. We observed that permitting the investigation of so many potential violations meant that officers in the field had virtually "unbridled discretion" in conducting checkpoint inquiries. *Id.* at ¶ 23. As an example of such discretion, we noted that the checkpoint plan permitted officers to "inspect and/or detect ... vehicle equipment violations." *Id.* We observed that officers were not given any guidance on how to conduct such inquiries and that while some officers might only check the headlights, others might undertake a "full 'diagnostic' exam." *Id.* We likened this lack of guidance on how to conduct the checkpoint inquiries to the "much hated and feared general warrants issued by the British Crown in colonial days, where British officers were given blanket authority to search wherever they pleased and for whatever might pique their interest." *Id.* at ¶ 26. Ultimately, we concluded that "a free society cannot tolerate such a practice." *Id.*

---

4.  The Court noted it did not have to decide whether "the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id.* at 47, n. 2, 121 S.Ct. 447.

5.  The Utah Highway Patrol had received a magistrate's authorization to conduct the administrative checkpoint pursuant to Utah Code Ann. section 77–23–104 (1999). The magistrate's approval allowed the UHP to conduct a multiple purpose vehicle checkpoint to "inspect and/or detect" the following violations:

(a) License plates, registration certificates, insurance certificates, and driver's licenses.
(b) Compliance with seat belt and child restraint laws.
(c) Drivers that may be under the influence of alcohol and/or other substances.
(d) Other alcohol and/or controlled substance violations.
(e) Vehicle equipment violations.
(f) Compliance with commercial vehicle regulations.

### III. ABELL'S CHALLENGES TO THE ADMINISTRATIVE VEHICLE CHECKPOINT

¶ 28 Abell argues that the checkpoint at which he was detained suffers from constitutional defects similar to the checkpoint we struck down in *DeBooy*.

#### A. Overbreadth of the Authorization and Excessive Officer Discretion

¶ 29 First, Abell argues that the authorization to conduct the multiple purpose checkpoint at issue was too broad. Abell contends that the authorization to investigate multiple legal violations gave individual officers too much discretion in deciding how to conduct checkpoint inquiries and inspections. Abell argues that this upsets the balance between individual liberties and the state's interest in promoting highway safety. Even though some aspects of the checkpoint may promote highway safety, he points out that permitting multiple inspections dilutes that interest: the more violations that are searched for, the lower the State's interest in promoting any one particular interest.

¶ 30 The State argues that the checkpoint plan at issue was drafted in light of our opinion in *DeBooy*, and, unlike *DeBooy*, involves an authorization that was not too broad and did not give officers excessive discretion. First, the State contends that, while officers in *DeBooy* were unconstrained in their discretion to conduct inspections for "vehicle equipment violations," officers in this case were only permitted "[t]o conduct exterior examination of vehicles for the required lights, turn signals, and other exterior required safety devices." Second, the State argues that officer discretion was limited because the checkpoint plan stated that inspection and inquiry procedures for passenger vehicles would last only thirty seconds and officers were directed only "to make a cursory walk around the vehicle inspecting for

plain view evidence of . . . violations." Third, the state argues that neither this court nor the United States Supreme Court has placed any "constitutional limitations on the number of 'checks' that a checkpoint plan may require." *DeBooy*, 2000 UT 32 at ¶ 38 (Russon, J., dissenting).

¶ 31 We will address each of the State's specific arguments in turn, but note from the outset that we see little meaningful difference in either the breadth of the authorization or the degree of officer discretion allowed at the checkpoints in *DeBooy* and this case. While the checkpoint in *DeBooy* purported to be a "sobriety checkpoint" and the checkpoint in this case to be a "drivers license" checkpoint, they are virtually indistinguishable given their multiple purpose authorizations. Minor changes in the wording of their respective authorizations notwithstanding, the six purposes described in the checkpoint plan in *DeBooy* are exactly the same as the purposes given for the checkpoint plan in this case.[6] The only exception is that here a seventh purpose was added, "to promote a safe public environment for all persons using the state highways." While the two checkpoints were ostensibly created for distinct purposes (sobriety checks and drivers license checks) they are actually indistinguishable given their multiple purpose character.

#### 1. Inspection of Vehicle Equipment Violations

¶ 32 Although, as the State points out, the language of the *DeBooy* checkpoint plan authorized inspection for any "vehicle equipment violations," the authorization in this case was hardly less broad. Here, the authorization required officers to conduct "exterior examination of vehicles for the required lights, turn signals, and other exterior required safety devices." The primary difference between these plans is that the inspections here were supposed to be limited to the

---

**6.** The checks authorized at this checkpoint are listed in the Background section of this opinion. The checks authorized in *DeBooy* appear in note 5. While the purposes given for the checkpoint are the same, the applications do differ in some respects. In *DeBooy*, the checkpoint stops were expected to last about two minutes, while in this case, the stops were estimated to last about thirty

seconds. *Brief for Appellee*, at add. A, *State v. DeBooy*, 2000 UT 32, 996 P.2d 546 (No. 981172). Additionally, the plan submitted in this case does include additional information concerning the sequence of traffic to be stopped as well and a list of instructions for officers operating the checkpoint.

exterior of the vehicle. However, the checkpoint plan does not contain any guidance on how officers are to conduct the exterior inspection, nor does it define what constitutes an "exterior required safety device." [7] Some officers may consider cracked windshields and bald tires to constitute exterior safety device violations, while others may not. For some officers, the presence of a particular light may be sufficient, while others may ask the driver to activate the light to ensure it operates correctly. We, along with the officers, are left to guess at the meaning of the "exterior safety device" inspection because neither the checkpoint plan, nor the record, provides one.

¶ 33 We conclude that limiting inspection to "exterior lights and other safety devices" does not provide a substantial check on individual officer discretion because of the sheer number of potential violations. Indeed, such an authorization permits officers to examine vehicles for one, some, or all of thirty potential violations of Utah law. [8] Critically, the checkpoint plan does not contain any guidance as to which devices officers were required to check, and which ones they were not. Furthermore, nowhere in the checkpoint plan is it stated whether officers were required to conduct the same kinds of checks on each vehicle. The risk that some officers might choose to check only the headlights

and tail lights of one vehicle, while subjecting another vehicle to a "full diagnostic exam" of all exterior lights and safety devices, remains. *DeBooy*, 2000 UT 32 at ¶ 23. Both courses of action would constitute "exterior examination of vehicles for the required lights, turn signals, and other safety devices," but would impact the occupants of the vehicles in very different ways. *See id.* We are not satisfied that the checkpoint plan ensured that all vehicles would be treated in the same manner. "Such unbridled discretion ... is inherently unreasonable under the Fourth Amendment and article I, section 14." *Id.*

2. Requirement of a Thirty Second or "Cursory" Inspection

■ ¶ 34 The State's contention that discretion was limited because passenger vehicles were only to be detained for thirty seconds and officers were directed "to make a cursory walk around the vehicle inspecting for plain view evidence of ... violations" does not satisfy the concerns about officer discretion we expressed in *DeBooy*. First of all, the thirty second guideline was only included in the section of the checkpoint application pertaining to the "sequence of traffic to be stopped." There is no mention of this time limit in the section of the plan that includes the instructions required to be given

---

7. We also note that it was left to the officer's discretion whether to tell drivers why they had been stopped in the first place. When asked whether drivers were told that they had reached a highway checkpoint, Trooper Chugg testified that "I'm not sure that it was routinely mentioned" and drivers were only told the reason for the stop if they asked. The absence of such a basic assurance of uniformity is highly troubling. Given this level of primary discretion, we doubt that all vehicles coming through the checkpoint could be handled through a routinized thirty-second inquiry.

8. Chapter 41 of the Utah Code requires the following lights and other exterior safety devices and also regulates their use: (1) Head lamps (41–6–119); (2) Tail lamps (41–6–120); (3) Stop lamps (41–6–121.10(a)); (4) Supplemental rear stop lamps (41–6–121.10(b)); (5) Flashing turn signal lamps (41–6–121.10(c)); (6) Additional lamps and reflectors for large vehicles (41–6–122); (7) Lamps or flags on loads extending beyond rear of vehicle (41–6–128); (8) Parking lamps (41–6–129); (9) Spot lamps (41–6–131); (10) Warning lamps (41–6–133); (11) Back-up lamps (41–6–133.5); (12) Requirement to display two lighted headlamps (41–6–139); (13) Requirement on direction of display of high intensity beams (41–6–140(1)); (14) Prohibition of colored lights visible from front of vehicle (41–6–140(2)); (15) Prohibition of some flashing lights (41–6–140(3)); (16) Requirements for colors of rear-facing lamps (41–6–140(4)); (17) Prohibition of unapproved lighting equipment (41–6–141(c)); (18) Horns and warning devices (41–6–146); (19) Mufflers (41–6–147); (20) Mirror mounted on left side of vehicle (41–6–148(a)); (21) Rear view mirror (41–6–148(b)); (22) Bumpers (41–6–148.33); (23) Safety chains on towed vehicles (41–6–148.40); (24) Prohibitions on low-riding and high-riding vehicles (41–6–148.32); (25) Windshields (41–6–149(1)); (26) Window tinting (41–6–149(2)); (27) Windshield wipers (41–6–149(5)); (28) Requirements for tires (41–6–150); (29) Mudguards or flaps (41–6–150.10); (30) Duty to display lights and illuminating devices at night (41–6–118). Utah Code Ann. § 41–6–117 et seq. (1998 & Supp.2002).

to officers conducting the checkpoint. Utah Code Ann. § 77–23–104(2)(a)(viii) (1999) (requiring that checkpoint plan include instructions for officers operating the checkpoint). Nor does the record reflect that officers were in fact instructed on the time estimate. The only time constraint mentioned in the "Instructions" section is that "[c]itizens will not be delayed longer than is reasonable to check driver licenses, registrations, proof of insurance certificates, and to observe for detectable violations visible from outside the vehicle." We believe there is potentially an enormous difference between a detention that is supposed to last only thirty seconds, and a detention that will last as long as it "reasonably" takes to check for all the above-listed violations.

¶ 35 The State's argument that the exterior examination of the vehicle was merely "cursory" also does little to mitigate our concern about the discretion of individual officers in conducting the checks. In fact, the requirement of a "cursory" examination raises more questions than it answers. The term "cursory" is never defined in the plan—but more troubling—it amounts to the only direct guidance given to officers on how they should inspect vehicles for any of the thirty exterior safety violations we have identified. Rather than provide a simple checklist of the most important lights and safety equipment to check, the State has left it to the officers in the field to decide how to conduct the inspection—so long as it complies with that officer's sense of what constitutes a "cursory" inspection of a particular vehicle.

¶ 36 Moreover, we doubt that it is possible to conduct all of the inquiries authorized at this checkpoint in just thirty seconds without investing officers with significant discretion to include or omit items authorized by the checkpoint plan.[9] Common sense suggests that for many drivers, unaware that they will be required to stop at a police checkpoint, it takes at least thirty seconds to produce a license and registration for inspection, let alone the time required for officers to run the computer checks necessary to determine their validity. The same is true for inspecting proof of insurance and the validity of license plates. In this case, these documentation checks were in addition to the exterior examinations of vehicles; with thirty exterior safety device violations alone to detect, it seems highly unlikely that a "reasonable" inspection of a vehicle at a multiple purpose checkpoint could be conducted in just thirty seconds unless officers used discretion to treat vehicles differently, omitting some items on each inspection.

### 3. Lack of Guidance for Conducting Sobriety Checks

¶ 37 We also note that the checkpoint instructions do not mention how, when, or if officers are to conduct checks on driver impairment—an area in which significant discretion may be involved. *Sitz*, 496 U.S. at 450–53, 110 S.Ct. 2481. To determine whether a particular driver in a stopped vehicle is impaired and should be singled out for additional sobriety testing requires an officer to make immediate and highly subjective judgments about the driver's appearance, attentiveness, speech patterns, breath smell, and reaction time. In some cases, such as where the smell of alcohol is obvious, this determination can be made very quickly. *Id.* at 447–48, 110 S.Ct. 2481 (noting twenty-five seconds required to evaluate impairment at alcohol sobriety checkpoint). In other cases, however, an officer may have nothing more than a hunch that the driver is impaired by another drug (such as cocaine) that lacks alcohol's familiar odor. In those cases, given the highly subjective nature of the inquiry, the decision to single out a driver for more exhaustive sobriety testing may vary substantially from one officer to the next. Thus, the failure to include any procedures or criteria to determine driver impairment is a fatal flaw in this checkpoint plan.[10] *United States*

---

9. This discussion is not intended to transform "thirty seconds" into the threshold amount of time officers are permitted to detain vehicles at a highway checkpoint. We intend only to cast doubt on the proposition that a checkpoint authorized to conduct so many independent checks

can do so in the time-frame suggested in the checkpoint plan.

10. We do not intend to cast doubt on the validity of sobriety testing as an acceptable purpose for conducting a checkpoint. *DeBooy*, 2000 UT 32

*v. Huguenin,* 154 F.3d 547 (6th Cir.1998) (noting that lack of appropriate operating procedures at sobriety checkpoint gave officers unfettered discretion and intruded on defendant's privacy). In the absence of reasonable suspicion, drivers have the right not to be "subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown,* 443 U.S. at 51, 99 S.Ct. 2637 (citing *Prouse,* 440 U.S. at 654–55, 99 S.Ct. 1391).

4. Limitation on Number of Checks Permitted

▆▆▆ ¶ 38 Finally, the State's argument that we have not placed a limit on the number of checks permitted at a highway checkpoint does not square with our opinion in *DeBooy.* In *DeBooy,* a majority of the court cast grave doubt on the constitutionality of multiple purpose checkpoints, holding:

> Multi-purpose, general warrant-like intrusions on the privacy of persons using the highways are unacceptable. The broader the authorization by the magistrate and the greater the discretion of the officer at the checkpoint, the more suspect the constitutionality of the checkpoint under article I, section 14. . . . This standard is necessary to safeguard the rights of the citizens of this state against unreasonable searches and seizures.

*DeBooy,* 2000 UT 32 at ¶¶ 31–32. We affirm that view today. Highway checkpoints are an extremely narrow exception to the general rule that reasonable suspicion is required before police are allowed to detain citizens, question them, and inspect their vehicles. *Id.* at ¶ 31. We permit checkpoints in order

to advance the singular purpose of "promoting [the] safe use of the highways." *Id.* Each element of the checkpoint plan must be "narrowly tailored" to serve this limited interest alone. *Id.* Here, the checkpoint was ostensibly a drivers license check, but included a half-dozen other checks unrelated to driver license violations. We see no justification for allowing the state to use the interest in enforcing the drivers license requirement as the predicate for permitting officers to conduct investigations for which they would otherwise need a warrant, probable cause, or reasonable suspicion. For these reasons, multiple purpose checkpoints that permit numerous independent checks related to one another only through their loose connection to the operation of a vehicle on the highway are constitutionally infirm.[11] *Id.* Given our conclusion that this checkpoint does not pass muster under the Utah Constitution or the governing statute as construed in *DeBooy,* we have no need to consider the additional bases on which Abell believes the checkpoint can be invalidated.

## IV. ROLE OF THE MAGISTRATE

▆▆▆ ¶ 39 In light of the conclusions we have reached in the previous sections, we believe it is important to discuss briefly the role of the magistrate in authorizing administrative vehicle checkpoints like this one. Under our checkpoint statute, the initial responsibility for ensuring that a checkpoint plan is narrowly tailored to promote highway safety, minimizes officer discretion, and protects every citizens' legitimate expectation of privacy rests with the magistrate authorizing the checkpoint. Utah Code Ann. § 77–23–104

---

at ¶ 21. Rather, the concern we express here is that none of the instructions in the checkpoint plan provide any guidance on how, among the ten other checks, the determination of driver impairment is to be conducted. In *Sitz,* the Supreme Court approved of Michigan's sobriety checkpoints where a written plan was developed, regularized procedures were employed, and every driver was examined briefly for signs of intoxication. *Sitz,* 496 U.S. at 447, 110 S.Ct. 2481. The checkpoint plan at issue here does not include a requirement that each driver be examined for signs of intoxication and nothing approaching a "regularized" procedure for determining driver impairment was included in the checkpoint plan.

11. As we noted in *DeBooy,* however, this rule

> applies only to suspicionless, investigatory, nonemergency checkpoints. We do not address, for example, emergency roadblocks that might be used to apprehend a fleeing felon. Nor do we address any existing authority to conduct roadblocks for traffic control purposes. Finally we do not address the constitutionality of fish and game roadblocks, or port of entry or commercial weigh and inspection stations instituted pursuant to other statutes.

*DeBooy,* 2000 UT 32 at n. 11.

(1999). When reviewing the checkpoint plan, the magistrate must critically consider whether the checkpoint plan's legitimate purposes are closely tied to the use and safety of the highway, and not to other law enforcement interests. To ensure that the discretion of individual officers is minimized, the magistrate must be careful to consider whether the checkpoint plan provides for the regularized, systematic detention of vehicles so that all who are stopped will be treated in the same manner to the greatest degree possible. The magistrate should not hesitate to ask law enforcement to provide additional information concerning the specific nature of the inquiries and inspections.

## CONCLUSION

¶ 40 The checkpoint in this case was virtually indistinguishable from the checkpoint we held unconstitutional in *DeBooy*. On paper, the checkpoint plan appeared to be a benign operation designed to advance multiple goals related to general highway safety. The record in this case reveals that the checkpoint plan submitted for the magistrate's approval differed substantially from how the checkpoint was actually operated—leaving officers in the field to decide how to conduct the checkpoint. We do not doubt that the state has a strong interest in drug interdiction. However, that interest must be pursued in such a way that important constitutional safeguards are not violated in the process.

¶ 41 Given the excessive level of discretion afforded to officers conducting the checkpoint, and the violations of our checkpoint statute, we hold that this checkpoint violated article I, section 14 of the Utah Constitution. Accordingly, "the evidence obtained against [the defendant] as a result of this illegal checkpoint must be excluded," *DeBooy*, 2000 UT 32 at ¶ 33, and we reverse the trial court's ruling denying his motion to suppress.

¶ 42 Associate Chief Justice Durrant and Judge Orme concur in Chief Justice Durham's opinion.

¶ 43 Justice RUSSON concurs in the result.

WILKINS, Justice, concurring in the result.

¶ 44 I concur in the result reached in the lead opinion.

¶ 45 Our prior decision in *State v. DeBooy*, 2000 UT 32, 996 P.2d 546, is directly on point, and controlling. The checkpoint plan at issue was too broad, and gave the officers too much discretion with regard to the length, scope, and nature of the stop and search imposed on passing motorists. Having so decided, it is unnecessary to engage in the speculation Mr. Abell invites regarding other factors arising in this particular case that may, or may not, somehow constitute additional justification for deeming the checkpoint plan and its execution unconstitutional.

¶ 46 I have no particular difficulty with the warning signs selected to alert motorists to the likelihood of traffic disruption. Signs saying "checkpoint ahead" might well be more precise, but the signs indicating "road work ahead" and "right lane closed" used in this instance are generic enough to warn of traffic conditions without creating undue concern for the motoring public, not all of whom were likely to be stopped. I also see no legal consequence in this case to the mere presence in the vicinity of the checkpoint of trained drug dogs. The dogs do not act independently of the officers with whom they are assigned. The officers were part of the checkpoint. The dogs were not involved in any way in the checkpoint activity until the officers had arrived at a reasonable, articulable suspicion of drug violations by Mr. Abell. Had the checkpoint plan and procedure been otherwise constitutional, Abell could have been held and drug dogs brought to the scene.

¶ 47 Our task, as a court, is to protect the rights of citizens from those who would do them harm, both by criminal acts and by usurpation of the right to be left unmolested while traveling. That balance is a difficult one to strike, given that in order for a case to reach us on review, the citizen challenging the police action must have been guilty of criminal activity in the first instance. Rarely do cases involving deprivation of constitution-

ally protected rights reach us in which the citizen was found to have had no indications of criminal activity on or with them in the car. As a result, any time we act to define the limits of police power in such circumstances, we by necessity relieve just consequences imposed on one who has violated our laws. A reversal here does the same. The defendant admits to having violated the laws of our state, but because law enforcement officials responsible for crafting the checkpoint plan tried too hard to cover all of their bases, balancing the various mandates of this court and the federal courts in the process of doing their job of protecting the public, we are forced to not only grant relief to Abell, but also publicly criticize and correct otherwise law abiding, well intentioned, justly motivated officers of the law. Would it were that a better system existed for such review. Rather than pushing the envelope for more or greater scope of enforcement power, it would perhaps have been better for those drafting the checkpoint plan to have acted with caution, and for the magistrate to have exercised slightly more diligence in review and approval of the plan.

¶ 48 Having recused himself, Justice Howe does not participate herein; Court of Appeals Judge Gregory K. Orme sat.