James SUBLETT, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 49A02–0312–CR–1023.

Court of Appeals of Indiana.

Oct. 13, 2004.

Brent Westerfield, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Appellant James Sublett was convicted of operating a motor vehicle after his privileges had been forfeited for life, a Class C felony.[1] Upon appeal, Sublett presents one issue for our review, which we restate as whether the trial court erred in admitting evidence resulting from a sobriety checkpoint which he claims was in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

We affirm.

The record reveals that in the evening of March 15, 2003, a sobriety checkpoint was operated by the Marion County Traffic Safety Partnership, a group comprised of representatives from various law enforcement agencies in Marion County. Lieutenant George Crooks of the Marion County Sheriff's Department supervised the checkpoint. Lieutenant Crooks has personally operated approximately fifteen to twenty sobriety checkpoints in the past. The March 15 checkpoint was conducted pursuant to written guidelines established by the Traffic Safety Partnership. The checkpoint stopped drivers traveling eastbound on East Tenth Street. The Traffic Safety Partnership approved this location. The location was chosen because police statistics from the previous year indicated that there were a high number of alcohol-related accidents and arrests for operating while intoxicated in the immediate area. The location was also well lighted, and a nearby parking lot provided a flat, safe surface for pursuing further investigations. The location also made it easy for police to close one lane of traffic while allowing other traffic to continue through other lanes. The checkpoint was operated during hours which statistics indicated a majority of alcohol-related accidents had occurred. On March 11, 2003, the Traffic Safety Partnership issued a press release to "major" newspapers, television stations, and radio stations in Marion County.[2]

---

1. Ind.Code § 9–30–10–17 (Burns Code Ed. Repl.1997).

2. The fax confirmation page in the record indicates that the release was sent to ten different fax numbers. However, the page only reveals the identities of "WFMS/WGRL," "WIBC," and "WENS." Exhibits Vol. at 52.

Lieutenant Crooks testified that he received confirmation that the fax machines to which he sent the press release did in fact receive them, but he did not know whether the media actually published the information.

Approximately fifty to one hundred yards west of the entrance to the checkpoint, police set up a fluorescent orange traffic sign which read, "[s]obriety checkpoint ahead." Transcript at 135. The sign was placed so that drivers traveling eastbound on Tenth Street had an opportunity to turn off onto another street before reaching the entrance point of the checkpoint. Lieutenant Crooks testified that only eastbound vehicles were stopped and he was "[a]bsolutely sure" that Sublett's vehicle was eastbound. Tr. at 133. Police had been instructed that avoiding the checkpoint was legal and that they could not stop a vehicle simply for doing so.

The police officers had no discretion regarding which vehicles would be stopped at the checkpoint. Instead, a pattern was followed in which the first three vehicles to arrive were stopped, and while those vehicles were detained, traffic was allowed to continue past the checkpoint. After the detained vehicles were released, the next three vehicles were stopped. Officers were also precisely instructed how to approach and screen the vehicles stopped. Pursuant to the written guidelines, officers would approach the vehicle, greet the driver and introduce themselves, and explain that they were conducting a sobriety checkpoint. They would then ask the driver to produce a driver's license and vehicle registration.[3] During their encounters, the officers would look for signs of intoxication such as the smell of alcohol, open alcohol containers, and lack of manual dexterity. This also gave the officer an opportunity to converse with the driver and observe the driver's ability to perform a task while his attention was divided. If the officer observed any signs of intoxication, the vehicle was directed to a "safe area" for further investigation. Vehicles which were pulled over but not detained for further investigation were detained for less than two minutes. In fact, the deputy prosecuting attorney at the checkpoint timed each stop with a stopwatch and testified that, outside of vehicles detained for further investigation, no vehicle was detained "even close to two minutes." Tr. at 107.

Sublett's vehicle was one of the vehicles stopped. Marion County Sheriff's Deputy Kerry Buckner approached Sublett's vehicle, identified himself, explained that the police were conducting a sobriety checkpoint, and asked to see Sublett's driver's license and vehicle registration. Instead of a driver's license, Sublett gave Deputy Buckner an Indiana identification card. Because Sublett did not produce a driver's license, Buckner checked Sublett's driving record on his mobile data terminal. This revealed that Sublett's driving privileges had been forfeited for life as a result of his being an habitual traffic violator. Deputy Buckner therefore placed Sublett under arrest.

On March 17, 2003, the State charged Sublett with operating a motor vehicle after his driving privileges had been forfeited for life, a Class C felony. On March 18, 2003, Sublett waived his right to a jury trial, and on May 20, 2003, filed a motion to suppress. The trial court held a com-

---

**3.** The written guidelines gave an example of a "uniform statement and question to the driver of the vehicles in the sobriety checkpoint line," as follows: "Good evening. You have been stopped at a sobriety checkpoint in an effort to detect and deter the impaired driver. May I see you driver's license and vehicle registration." Exhibits Vol. at 8.

bined bench trial and hearing on the motion to suppress on July 31, 2003. At the end of the hearing, the trial court took the matter under advisement, and on August 14, 2003, the trial court denied the motion to suppress and found Sublett guilty as charged. Following a sentencing hearing held on October 3, 2003, the trial court imposed a sentence of four years executed with a direct commitment to Community Corrections.

▇▇▇ Upon appeal, Sublett claims that the sobriety checkpoint was conducted in a manner which violates both the Fourth Amendment to the United States Constitution, as applicable to the states via the Fourteenth Amendment, and Article 1, Section 11 of the Indiana Constitution. We will address each contention in turn, but we first note our standard of review.[4] As the State correctly notes, the case at bar is not an interlocutory appeal from the trial court's denial of Sublett's motion to suppress. Instead, Sublett appeals following his bench trial and conviction. Accordingly, the issue before us is properly framed as whether the trial court erred in admitting the evidence which resulted from the allegedly illegal seizure. *See Washington v. State*, 784 N.E.2d 584, 586–87 (Ind.Ct.App.2003). A trial court has broad discretion in deciding whether to admit evidence. *Id.* at 587. We will reverse the trial court's ruling only when it has abused this discretion, i.e. when the trial court's decision is contrary to the facts and circumstances before it. *Id.*

▇▇▇ With regard to his argument under the Fourth Amendment, traffic checkpoints have been held constitutional under certain circumstances. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444,

110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (holding that Michigan's use of highway sobriety checkpoints did not violate the Fourth Amendment); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (invalidating discretionary, suspicionless stops for a spot check of motorists' driver's license and vehicle registration but suggesting that questioning of all oncoming traffic at roadblock-type stops would be a lawful means of serving interest in highway safety); *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating checkpoint whose primary purpose was to detect evidence of "ordinary criminal wrongdoing," more particularly drug crimes). Thus, suspicionless traffic checkpoints for the purpose of either removing drunk drivers from the road or verifying driver's licenses and vehicle registrations appear to be permissible under the Fourth Amendment.

In *Sitz*, the Court applied a three-part test derived from *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), balancing the state's interest in preventing accidents caused by drunk drivers, the degree to which the checkpoint advances the public interest, and the level of intrusion upon an individual's privacy caused by the checkpoints. The *Sitz* Court concluded that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." 496 U.S. at 451, 110 S.Ct. 2481. The Court further held that the measure of the intrusion upon motorists stopped briefly at a sobriety checkpoint was slight. *Id.* The Court was clear, however, about the precise nature of the issue before it, specifically noting that

---

4. Sublett fails to mention the applicable standard of review in his brief. *See* Ind. Appellate Rule 46(A)(8)(b) ("The argument must include for each issue a concise statement of the applicable standard of review; this statement may appear in the discussion of each issue or under a separate heading placed before the discussion of the issues.")

there were no allegations of unreasonable treatment of any person after an actual detention took place at a checkpoint. *Id.* at 450, 110 S.Ct. 2481. In doing so, the Court stated, "We address only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers. Detention of a particular motorist for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." *Id.* at 450–51, 110 S.Ct. 2481.

Sublett attempts to distinguish the situation before the Court in *Sitz* from the case at bar by noting that in *Sitz*, the police checked the driver's license and registration only after signs of intoxication had been observed.[5] *See Sitz*, 496 U.S. at 447, 110 S.Ct. 2481. Sublett argues that in this case, the police action of asking for his driver's license and vehicle registration was unreasonably intrusive because it was unrelated to the justification for the stop. The State correctly observes, however, that in determining the validity of the sobriety checkpoint in *Sitz*, this fact was not mentioned as a factor by the Court.

Here, it is undisputed that the justification for the checkpoint in this case was to prevent drunken driving. The police practice of asking a driver for his license and vehicle registration gave them the opportunity to look for signs of intoxication.[6]

Sublett admits that had one of the purposes of the checkpoint been the prevention of unlicensed drivers, then asking drivers for their license and registration would likely be constitutionally permissible. *See Edmond*, 531 U.S. at 39, 121 S.Ct. 447; *Prouse*, 440 U.S. at 663, 99 S.Ct. 1391. But, his argument continues, because the purpose was the prevention of drunken driving, asking for a license and registration was too intrusive and unreasonable.

Sublett's argument effectively asks us to hold that two rights somehow make a wrong. In analyzing the *Brown* factors, the *Sitz* Court held that the degree of intrusion upon the motorists stopped in that case was slight. The only explanation of the procedure used in that case was that drivers at the checkpoint were "briefly examined" for signs of intoxication. *Id.* at 447, 110 S.Ct. 2481. The same can be said here. Excepting drivers who were further investigated, the drivers detained at the checkpoint were stopped for a very short time—not even two minutes. We decline to hold that asking a motorist to produce his driver's license and vehicle registration, which appears to be constitutionally permissible, at a sobriety checkpoint is unreasonably intrusive simply because the particular purpose of the checkpoint is the prevention of drunken driving.[7] Any additional intrusion is slight.

5. Sublett makes no recognizable argument regarding the other two prongs of the *Brown* test, i.e. balancing the state's interest in preventing drunken driving and the degree to which the checkpoints advance this interest.

6. Sublett's argument implies that asking for license and registration was merely a subterfuge for achieving a different purpose other than identification.

7. Sublett cites *State v. Gerschoffer*, 763 N.E.2d 960 (Ind.2002), for the contention that the " 'thought that an American can be compelled to "show his papers" before exercising his rights to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals.' " *Id.* at 968 (quoting *State v. Record*, 150 Vt. 84, 548 A.2d 422, 426 (1988)). However, the *Gerschoffer* court made this statement in the context of analyzing the defendant's claim under Article 1, Section 11 of the Indiana Constitution, not the Fourth Amendment. *See* 763 N.E.2d at 967–68. The two analyses are similar but distinct. We address Sublett's Article 1, Section 11 claim *infra*.

Our holding is not in conflict with *Edmond, supra,* in which narcotics checkpoints by the City of Indianapolis were held to violate the Fourth Amendment. The *Edmond* Court rejected the City's argument that the checkpoint, despite its unlawful primary purpose, was justified by its lawful secondary purpose of keeping impaired motorists off the road and verifying licenses and registrations. 531 U.S. at 46–47, 121 S.Ct. 447. In contrast, the primary purpose of the checkpoint in question here was preventing drunken driving, which unlike the narcotics checkpoint in *Edmond,* is itself proper.[8] The trial court's conclusion here that the checkpoint was valid under the Fourth Amendment was not in error.

■ We now turn to the question of the validity of the checkpoint under Article 1, Section 11 of the Indiana Constitution. Our analysis under Article 1, Section 11 is governed by the opinion of the Indiana Supreme Court in *State v. Gerschoffer,* 763 N.E.2d 960 (Ind.2002). The facts in that case were that the Indiana State Police and the Mishawaka Police Department conducted a sobriety checkpoint in Mishawaka. Gerschoffer was arrested for drunken driving at the checkpoint and moved to suppress the evidence obtained from the checkpoint. The trial court granted the motion, and upon transfer,[9] our Supreme Court declined to hold that all roadblocks are per se violations of the state constitution: "A minimally intrusive roadblock designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation is constitutionally reasonable, unlike the random and purely discretionary stops we have disapproved." *Id.* at 966. In determining the validity of the roadblock in that case, the *Gerschoffer* court found several factors significant: (1) a neutral plan approved by appropriate officials; (2) the objective, location, and timing of the roadblock; (3) the level of police discretion; (4) the degree of intrusion; (5) whether the roadblock was conducted safely; and (6) the roadblock's effectiveness. *Id.* at 967–971. In light of those factors, with particular emphasis on the high level of officer discretion and the weak link between the public danger posed by drunken driving and the objectives, location, and timing of the checkpoint, the *Gerschoffer* court held that the State failed to establish that the roadblock under consideration was reasonable under Article 1, Section 11. *Id.* at 971.

We first note that Sublett incorrectly characterizes the factors listed by the *Gerschoffer* court as "criteria" which he suggests must be met in order for a roadblock to be reasonable under Article 1, Section 11. The *Gerschoffer* court, however, clearly listed these as factors to be weighed and considered, not required elements. Perhaps because of this view, Sublett focuses his attack on only two of the *Gerschoffer* factors. First, Sublett claims that the police gave improper notice of the checkpoint, specifically attacking the placement of the sign which warned motorists that a sobriety checkpoint was ahead. The *Gerschoffer* court, in analyzing the degree of intrusion factor, considered whether the

**8.** Although the police checkpoint procedure in *Edmond* also called for officers to request the driver's license and vehicle registration, 531 U.S. at 35, 121 S.Ct. 447, this procedure was not cited as supporting or detracting from the validity of the stop.

**9.** Upon direct appeal, this court affirmed the trial court, holding that a sobriety checkpoint conducted without probable cause or reasonable suspicion of illegal activity constituted an unreasonable search under Article 1, Section 11. *See State v. Gerschoffer,* 738 N.E.2d 713 (Ind.Ct.App.2000), *trans. granted, opinion vacated.*

checkpoint was avoidable; the more avoidable a checkpoint is, the less it interferes with the liberty of individual drivers. *Id.* at 969. However, a checkpoint need not be altogether voluntary, or it would have little enforcement or deterrent value. *Id.* Although the police set up a sign in *Gerschoffer*, the sign was illuminated only when hit by headlights, and, more importantly, was set up beyond the entry point for the checkpoint. *Id.* at 970. Therefore, approaching drivers may not have realized the activity ahead of them was a checkpoint until it was too late to turn back. *Id.* Despite these concerns, the court held that the lack of demonstrated avoidability weighed only "slightly" against the State. *Id.*

In the present case, the police set up a fluorescent orange traffic sign announcing the checkpoint fifty to one hundred yards west of the entrance to the checkpoint, and made sure that the sign was placed so that drivers had an opportunity to turn off onto another street and avoid the checkpoint. Only vehicles traveling eastbound were stopped, and Sublett's car was one such vehicle. Sublett makes much of the fact that drivers turning east onto Tenth Street from Gladstone Street were not necessarily able to see the sign giving notice of the checkpoint because the sign was placed between the north-south streets of Colorado and Gladstone. However, there is nothing in the record to indicate that Sublett turned off of Gladstone onto Tenth Street and was in fact unable to see the sign. Given the location of the sign and the fact that drivers were given an opportunity to avoid the checkpoint after being warned about it by the sign, we cannot say

that the avoidability weighs against the State.[10]

As he did under his Fourth Amendment argument, Sublett attacks the police practice of asking the stopped motorists for their driver's license and vehicle registration. Sublett claims that this is unrelated to the objective of the checkpoint—to detain and deter drunken drivers. A seizure is not reasonable unless it is well calculated to effectuate its purpose. *Gerschoffer*, 763 N.E.2d at 967. The State contends that asking a driver for his license and registration gave the police a chance to observe the drivers for signs of intoxication. Sublett responds that this practice is not minimally intrusive and that other, less intrusive means could have been used.

In support of his argument, Sublett refers to the portion of *Gerschoffer* wherein the court criticized the objective of the checkpoint at issue in that case. In *Gerschoffer*, the press release stated that the checkpoint was intended to stop drunken drivers, seat belt and child restraint violators, and "other violations." *Id.* One of the officers in charge testified that the location was selected to reduce speeding and "cruising," and that the checkpoint was "a good way to kind of slow traffic down, [and] make sure everybody is doing what they're supposed to." *Id.* That officer also testified that another goal of the checkpoint was to ensure that drivers had "'the proper information with them,' including '[l]icense, registration, insurance information.'" *Id.* at 967–68. In response to this, the *Gerschoffer* court agreed with the Vermont Supreme Court which wrote, "'[t]he thought that an American can be compelled to 'show his papers' before exer-

---

**10.** Indeed, the *Gerschoffer* court actually contrasted the placement of the sign in that case with the Marion County Traffic Safety Partnership checkpoint procedures, which call for a checkpoint sign to be placed, as was done here, on the opposite side of the intersection where the checkpoint is, so that motorists may turn off before reaching the checkpoint. *See id.* at 970 n. 11.

cising his right to walk the streets, drive the highways or board trains is repugnant to American institutions and ideals.' " *Id.* at 968 (quoting *State v. Record*, 150 Vt. 84, 548 A.2d 422, 426 (1988)).[11] The *Gerschoffer* court then rejected the State's goal of " 'mak[ing] sure everybody is doing what they're supposed to,' " as being more akin to a generalized dragnet than a minimally intrusive, neutral effort to remove impaired drivers from the roadways. *Id.* In *Gerschoffer*, the State also failed to establish that the location and timing of the checkpoint were closely related to the problem of drunken driving. *Id.* Taking this into consideration, the court concluded that the State had not shown that the checkpoint was sufficiently related to the legitimate law enforcement purpose of combating drunken driving. *Id.*

Here, although the police could perhaps have come up with less intrusive means of observing drivers for signs of intoxication, we do not consider the practice used here to be unreasonable. The *Gerschoffer* court was faced with a situation where the police objectives were broad and diffuse. In the present case, there was no indication that the police were out to insure that drivers were wearing their seatbelts or to stop drivers from speeding or "cruising." Indeed, there was testimony that the location of the checkpoint was made in response to high levels of drunk driving arrests and alcohol-related traffic incidents in the area. The evidence also indicated that the timing of the checkpoint was chosen because of police statistics which indicated that the majority of alcohol-related accidents and arrests occurred during those hours. This contrasts with the situation in *Gerschoffer* where the State failed to offer any evidence of a high rate of alcohol-related accidents or arrests in the chosen areas or that the timing of the checkpoint was related to the danger being addressed. *Id.*

Although not challenged by Sublett upon appeal, we also note that the police officers involved in the checkpoint at issue in the present case had no discretion regarding which vehicles to stop and what to do once the vehicles were stopped. Instead, three vehicles at a time were methodically stopped, and while these vehicles were briefly detained, other traffic would continue through the checkpoint. Officers were instructed what to do and say when they talked with the drivers of the stopped vehicles. The officer who stopped Sublett's car behaved accordingly.

Given this lack of discretion, and the scripted, consistent manner in which the police officers conducted themselves, we are unable to say that the practice of requesting the driver's license and vehicle registration of the stopped motorists was so intrusive and unrelated to the objective of the checkpoint as to render the checkpoint constitutionally unreasonable. Although we recognize and share the concern of our Supreme Court that the police in *Gerschoffer* were conducting what amounted to a generalized check to "make sure everybody was doing what they were supposed to," we are unable to say the same regarding the checkpoint at issue here. The request for the license and registration gave the officers not only a chance to observe the drivers firsthand, but also allowed them to observe their behavior while their attention was divided. While perhaps not the least intrusive method, we are not of the opinion that it rose above the constitutionally required

---

11. We do not read this language used by our Supreme Court to suggest any abandonment of the long-held position that there is no fundamental right to drive a motor vehicle. *See* *Mitchell v. State*, 659 N.E.2d 112, 116 (Ind. 1995); *Ruge v. Kovach*, 467 N.E.2d 673, 677 (Ind.1984).

status of minimal intrusion. The objective, location, and timing of the checkpoint do not weigh against the constitutionality of the checkpoint in question.

Perhaps because of his belief that the factors listed in *Gerschoffer* are required elements which must be satisfied, Sublett does not address the remaining factors. As the State points out, however, these remaining factors weigh in favor of a determination that the checkpoint was reasonable: the checkpoint was conducted pursuant to a plan approved by the Traffic Safety Partnership; there was no individual officer discretion; the detention of stopped motorists lasted well under two minutes; the checkpoint was safely conducted in a well-lighted area and detained motorists were diverted into an adjacent parking lot. Considered along with the objective, location, and timing of the checkpoint, the level of intrusion, and the effectiveness of the checkpoint,[12] Sublett has not convinced us that the trial court erred in determining that the checkpoint was not unreasonable for purposes of Article 1, Section 11. Therefore, the trial court did not err in admitting the evidence obtained as a result of the stop of Sublett's vehicle at the checkpoint.

The judgment of the trial court is affirmed.

MAY and VAIDIK, JJ., concur.

---

12. The checkpoint in the present case was established to be somewhat more effective than that in *Gerschoffer*.