## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 17 2017, 8:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Victor Gersdorff,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 17, 2017<br><br>Court of Appeals Case No.<br>49A02-1608-CR-1785<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Linda Brown, Judge<br><br>Trial Court Cause No.<br>49F10-1404-CM-21772 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Victor Gersdorff (Gersdorff), appeals his conviction for Count I, possession of marijuana, a Class A misdemeanor, Ind. Code § 35-48-4-11(1); Count II, possession of paraphernalia, a Class A misdemeanor, I.C. § 35-48-4-8.3(a)(1)(b); Count III, operating a vehicle while intoxicated, a Class C misdemeanor, I.C. § 9-30-5-2(a); and Count IV, operating a vehicle with a schedule I or II controlled substance or its metabolite in the body, a Class C misdemeanor, I.C. § 9-30-5-1(c).

We affirm.

# ISSUE

Gersdorff raises one issue on appeal, which we restate as: Whether the trial court abused its discretion by admitting evidence discovered following a police sobriety checkpoint.

# FACTS AND PROCEDURAL HISTORY

During the early morning hours of April 27, 2014, a sobriety checkpoint was operated by the Indianapolis Metro Police Department (IMPD) at 1305 Broad Ripple Avenue, in Indianapolis, Indiana. Lieutenant Mark McCardia (Lieutenant McCardia) of the IMPD supervised the checkpoint. He had been part of "hundreds" of checkpoints and had been the commanding officer on "at least" fifty checkpoints. (Transcript pp. 25, 26). The checkpoint was approved by the Marion County Traffic Safety Partnership, the police chief, and the prosecutor's office. Ten days prior to the checkpoint being operated, a news

release was emailed to several television, radio, and print media organizations, which listed the date, time, and location of the checkpoint.

[5] The specific objective of the checkpoint was to "deter drunk driving, [and] apprehend drunk drivers." (Tr. p. 15). Its location was chosen because "crash data from the past few years" had revealed "a lot of drunk driver arrests and drunk driving crashes" in that area. (Tr. p. 15). Multiple signs, "like five (5) foot reflector signs," were posted to alert drivers of the upcoming checkpoint, and the checkpoint was avoidable from all directions. (Tr. p. 19). The checkpoint was well lit with street lights, vehicle flashers, emergency equipment, and reflective signs and cones. The weather was clear and the temperature was approximately sixty degrees Fahrenheit.

[6] In working the checkpoint, the officers were mandated to follow a specific procedure. Specifically, officers were required to direct two vehicles at the same time to the checkpoint. They could "not deviate" from this sequence, and all vehicles in the sequence had to be checked. (State's Exh. 1). The officers were required to identify themselves and "advise the motorist 'You have been stopped at a Marion County Traffic Safety Partnership Sobriety Checkpoint. We use checkpoints to deter impaired drivers. Have you had anything to drink this evening?'" (State's Exh. 1). They then asked to see the driver's license and registration. A vehicle would be detained for two minutes or less unless further investigation was warranted. If a driver exhibited signs of impairment, the officers would instruct "the driver [to] pull the vehicle into the 'pull-off' area."

(State's Exh. 1). That night, eighteen vehicles went through the checkpoint, with two drivers being apprehended.

[7] Gersdorff was the first car that pulled into the checkpoint that evening, driving "approximately maybe twenty-five miles per hour." (Tr. p. 42). He stopped at Captain Donald Weilhamer's (Captain Weilhamer) position. When Gersdorff rolled down his window, Captain Weilhamer observed "a strong odor of marijuana coming from the vehicle." (Tr. p. 43). Gersdorff had "problems pulling [his driver's license] out of his wallet" and "he was slow at answering" questions. (Tr. p. 43). Captain Weilhamer asked Gersdorff to exit his vehicle. After Gersdorff moved to the side, Officer Robert Ferguson (Officer Ferguson), who was assisting Captain Weilhamer, "moved the vehicle out of the line." (Tr. p. 44). Captain Weilhamer informed Gersdorff that he wanted to do some field sobriety checks. While talking to Gersdorff, Captain Weilhamer noticed Gersdorff's dilated and bloodshot eyes and "slower than usual" walk. (Tr. p. 44). Captain Weilhamer administered three field sobriety tests, two of which Gersdorff passed. While Gersdorff participated in the field sobriety tests, Officer Ferguson moved Gersdorff's vehicle. In the car, Officer Ferguson noticed a "very strong" smell of marijuana. (Tr. p. 73). The odor was particularly strong "right where the center console" was. (Tr. p. 74). He raised the center console and noticed a black bag. In opening the bag, Officer Ferguson found a "raw, green, leafy substance" along with "a pipe," which is "commonly used to ingest marijuana into the system." (Tr. p. 75).

[8] Captain Weilhamer informed Gersdorff of his *Miranda* rights. Gersdorff agreed to answer some questions and told Captain Weilhamer that he had smoked marijuana earlier that day. Captain Weilhamer read Gersdorff the implied consent law and Gersdorff agreed to a blood draw. After the blood draw, Captain Weilhamer arrested Gersdorff. Upon searching him, Captain Weilhamer disovered a black box in Gersdorff's lower pocket that contained a "greenish-brown, leafy-type substance," which later tested positive for marijuana. (Tr. p. 61).

[9] On April 27, 2014, the State filed an Information, charging Gersdorff with Count I, possession of marijuana, a Class A misdemeanor; Count II, possession of paraphernalia, a Class A misdemeanor; and Count III, operating while intoxicated, a Class C misdemeanor. The State later amended the Information to add Count IV, operating a vehicle with a schedule I or II controlled substance or its metabolite in the body, a Class C misdemeanor. On July 12, 2016, the trial court conducted a bench trial. During trial, Gersdorff moved to suppress the evidence discovered during the sobriety checkpoint, which was denied by the trial court. At the close of the evidence, the trial court found Gersdorff guilty as charged. At the sentencing phase, the trial court merged Count IV into Count III and entered judgment of conviction on Counts I, II, and III. The court sentenced Gersdorff to concurrent terms of 365 days with 361 days suspended to probation on Count I, 365 days with 361 days suspended to probation on Count II, and 60 days with 50 days suspended to probation on Count III.

[10] Gersdorff now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[11] Gersdorff contends that the trial court abused its discretion in admitting evidence discovered during a sobriety checkpoint, which he claims was in violation of Article 1, Section 11 of the Indiana Constitution. The standard of review for admissibility of evidence is an abuse of discretion. *Weinberger v. Boyer*, 956 N.E.2d 1095, 1104 (Ind. Ct. App. 2011), *trans. denied*. The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id*. Even when the trial court erred in its ruling on the admissibility of evidence, this court will reverse only if the error is inconsistent with substantial justice. *Id*.

[12] Article I, Section 11, must be liberally construed to guarantee the right of the people to be secure in their persons, houses, papers and effects, and to protect them against unreasonable search and seizure. *King v. State*, 877 N.E.2d 518, 521 (Ind. Ct. App. 2007). The purpose of this provision is to protect against unreasonable police activity in areas of life that Indiana citizens regard as private. *Id*.

[13] In *Gerschoffer*, our supreme court "join[ed] those jurisdictions rejecting the contention that all roadblocks are *per se* violations of state constitutional requirements" and set out the criteria to determine whether a particular sobriety checkpoint "was conducted in a constitutionally reasonable manner." *Gerschoffer v. State*, 763 N.E.2d 960, 966 (Ind. 2002). The court held that "[a]

minimally intrusive roadblock designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation is constitutionally reasonable, unlike the random and purely discretionary stops we have disapproved." *Id.* Among the relevant factors to be considered and weighed are: (1) whether the roadblock was staged pursuant to a formal, neutral plan approved by appropriate officials; (2) the objective, location, and timing of the checkpoint, taking these factors into account to determine whether the seizure was well calculated to effectuate its purpose; (3) the amount of discretion exercised by field officers conducting the checkpoint, with a goal of minimal discretion to ensure against arbitrary or inconsistent actions by the screening officers; (4) the degree of intrusion and whether the roadblock was avoidable; (5) whether the surrounding conditions of the checkpoint were safe; and (6) whether the checkpoint was effective. *Id.* at 967-70. We will evaluate each factor in turn.

## I. *Formal, Neutral Plan*

Gersdorff claims that Lieutenant McCardia's "mere assertion that 'we have standardized plans' and that 'there are all sorts of plans involved' does not allow this [c]ourt to review whether it was a reasonable, neutral plan." (Appellant's Br. p. 14). In *Gerschoffer*, the guidelines police followed in conducting the roadblock were not made a part of the record on appeal, so our supreme court was unable to "assess their efficacy." *Id.* at 967. Instead, the court cited with approval guidelines set out in a Connecticut case, *State v. Boisvert*, 671 A.2d 834 (Conn. App. 1996). In *Boisvert*, the guidelines

promulgated by the public safety commissioner required, "among other things, advance approval by ranking officers; a careful choice of location, date and time 'after considering many factors, including the safety of the public and those conducting the operation and the potential inconvenience to the public'; advance publicity; and assurance to drivers that the stop was routine." *Gerschoffer*, 763 N.E.2d at 967 (quoting *Boisvert*, 671 A.2d at 837).

[15] Our review of the evidence indicates that the checkpoint had been approved by the Marion County Traffic Safety Partnership, the police chief, and the prosecutor's office. The choice of location was based on "crash data from the past few years" which had revealed "a lot of drunk driver arrests and drunk driving crashes" in that particular area. (Tr. p. 15). The officers conducting the sobriety checkpoint had participated in many checkpoints and had several years of experience of conducting them. The State presented evidence and entered into evidence as State's Exhibit 1, the checkpoint's briefing, its goals, objectives, and procedures—which was implemented by Lieutenant McCardia while conducting the checkpoint.

[16] The checkpoint itself was well advertised with multiple signs alerting drivers of its presence. It was well lit with street lights, reflective signs, and cones. While conducting the checkpoint, the officers were required to follow a specific procedure, which mandated the pattern of cars to be pulled into the checkpoint, and provided the officers with a specific script to follow and advisements to administer.

[17]   Ten days prior to the operation of the checkpoint, a press release notifying the date, time, and location of the checkpoint was sent to the following radio, television, and print media: the Speedway Police Department; Advocates Against Impaired Driving; the Associated Pres; Fox 59 News; the Indiana Herald; the Indianapolis Star; the Indy Recorder; La Voz De Newspaper; Media Relations, IMPD; the Southside Times; The Daily Journal; The Greenfield Reporter; Univision; WEDJ; WFBQ Q95; WFMS Radio; WFYI; WIBC Radio; WISH TV Channel 8; WRTV Channel 6; WTHR Channel 13; WTLC Radio; and the City of Lawrence. Although Gersdorff contends that there was no proof that someone actually publicized the impending roadblock, *Gerschoffer* noted that "[l]aw enforcement agencies cannot control what the media chooses to report, of course, and may not have funds to pay for publicity." *Gerschoffer*, 763 N.E.2d at 970-71. While no evidence is included that the information from the press release was disseminated by the media to the general public, the record includes evidence supporting a reasonable inference that the press release was distributed. *See also Sublett v. State*, 815 N.E.2d 1031, 1033 (Ind. Ct. App. 2004) (finding a nearly identical sobriety checkpoint constitutional under the Indiana Constitution where the police "did not know whether the media actually published the information"). Accordingly, as a formal, neutral plan was in place to conduct the checkpoint, we cannot say that this element weighs against its constitutionality.

## II. *Objective, Location, and Timing*

[18] Next, Gersdorff claims that "the objective, location and timing of the roadblock was not sufficiently established at trial." (Appellant's App.p. 16). In *Gerschoffer*, the stated objective—rejected by the court—for the checkpoint was a "montage of objectives, including the generic law enforcement goal of 'mak[ing] sure everybody is doing what they're supposed to [do].'" *Gerschoffer*, 763 N.E.2d at 968. In contrast here, the objective was "[t]o deter impaired driving and increase the risk of apprehension of impaired drivers." (State's Exh. 1). The timing of the checkpoint was 11:00p.m. until 1:30a.m. Pursuant to Lieutenant McCardia's testimony, the location was chosen based on previous years' crash data which had revealed numerous drunk driver arrests and crashes in the particular area. Again, this element weighs in favor of the constitutionality of the checkpoint.

### III. *Police Discretion*

[19] Considering police discretion a "critical factor," the *Gerschoffer* court requires "sufficiently explicit guidance to ensure against arbitrary or inconsistent actions by the screening officers." *Gerschoffer*, 763 N.E.2d at 968-69. The record reflects that standardized instructions were given to ensure that officers addressed drivers in a consistent manner. Specifically, State's Exhibit 1 details the routine to be followed during the checkpoint as follows:

**Sequence of Vehicle Selection and Public Interaction**

**Do not** deviate from the sequence of vehicle selection. **All** vehicles in the sequence will be checked, including police and fire vehicles.

Identify yourself and advise the motorist "You have been stopped at a Marion County Traffic Safety Partnership Sobriety Checkpoint. We use checkpoints to deter impaired drivers. Have you had anything to drink this evening?" **Check for DWI clues**. Advise the motorist you would like to see a driver's license and registration.

Vehicles should be held in line no longer than **2** minutes.

If alcohol is detected or additional investigation is needed, have the driver pull the vehicle into the "pull-off" area.

Large trucks may be checked on the street to lessen change of damage to the parking lots. However, trucks should be pulled out of the way so not to block traffic.

Please assist vehicles out of the checkpoint.

Avoidance of a checkpoint alone does not constitute a legal stop.

Testimony by officers at trial confirmed that the officers behaved accordingly during the checkpoint. The officers pulled in two vehicles at the same time after which they gave the drivers the introductory statements and acted in conformity with the script. Given the lack of discretion and the scripted, consistent manner in which the officers had to conduct themselves, this element weighs in favor of constitutionality of the checkpoint.

## IV. *Degree of Intrusion*

[20] "In evaluating the degree of intrusion, we also consider whether the roadblock was avoidable. The more avoidable a roadblock is, the less it interferes with the liberty of individual drivers." *Gerschoffer*, 763 N.E.2d at 969. Here, prior to arriving at the checkpoint, drivers were alerted by "five (5) foot reflector signs." (Tr. p. 19). Lieutenant McCardia testified that no matter in which direction a car was travelling, the checkpoint was avoidable from all directions. Accordingly, and Gersdorff agrees, the signage and possibility of avoiding the checkpoint weigh in favor of it being constitutional.

## V. *Safety of the Checkpoint*

[21] Here, the State offered testimony that the checkpoint was located in a well-lit area, where vehicles could be pulled off the roadway into an adjacent parking lot without impending traffic. *See Gerschoffer*, 763 N.E.2d at 970; *see also Sublett*, 815 N.E.2d at 1039 ("[T]he checkpoint was safely conducted in a well-lighted area and detained motorists were diverted into an adjacent parking lot"). The evidence indicates that the weather was clear and the temperature was approximately sixty degrees Fahrenheit. Drivers were stopped in the eastbound lane of Broad Ripple Avenue or 62nd street. Every first two cars were waived into the Flanner and Buchanan parking lot, used by the officers to conduct the sobriety check. There was lighting in the parking lot and the officers also used vehicles with flashers and reflective signs to alert drivers to what was happening. Accordingly, this element weighs in favor of its constitutionality.

## VI. *Effectiveness*

[22] Lastly, Gersdorff disputes the effectiveness of the sobriety checkpoint. Lieutenant McCardia testified to the effectiveness of the checkpoint in that the ratio of people stopped were consistent "with the statistics that were presented." (Tr. p. 24).

[23] The *Gerschoffer* court, in analyzing the effectiveness of the checkpoint, observed that "advance publicity" of a sobriety checkpoint can "scare[] those who would drink and drive off the roads." *Gerschoffer*, 763 N.E.2d at 970. The court held that, given the "fairly low percentage" of OWI arrests[1] obtained in that roadblock and the lack of evidence of advance publicity of the roadblock, it could not infer that that the checkpoint had "effectively deterred potential offenders." *Id*. at 971. Here, out of eighteen vehicles that were stopped at the checkpoint, the police made two arrests. Compared to the two arrests out of seventy stops in *Gerschoffer*, the arrest rate here, while not a high percentage in itself, was significantly higher.

[24] "Apprehension rates are not, however, the end of the question." *Gerschoffer*, 763 N.E.2d at 970. "[R]oadblocks can effectively deter OWI, such that even a modest arrest rate may simply reflect the fact that advance publicity scared those who would drink and drive off the roads." *Id*. However, we also noted

---

[1] In *Gerschoffer*, the police stopped seventy out of 198 cars "funneled through the checkpoint" and made only two arrests for OWI. *Gerschoffer*, 763 N.E.2d at 970.

that while the existence of the sobriety checkpoint was released to the media at large, here, there is no evidence that this information was disseminated to the general public. Without direct evidence showing that the checkpoint was actually publicized, it is more doubtful that the checkpoint had a deterrent effect. Therefore, while the arrest rate for operating while intoxicated was higher than that obtained in *Gerschoffer*, we cannot say that the effectiveness factor weighs significantly in favor of the State.

## VII. *Summary*

[25] Gersdorff concedes two *Gerschoffer* factors—police discretion and degree of intrusion—but argues that the others were not satisfied. We disagree. There is substantial evidence in the record that the officers implemented a properly approved, neutral plan that included, among other things, advanced distribution of a media release to a significant number of local media outlets. Additionally, the record establishes that a narrow objective was established for the checkpoint, the timing/location was based on OWI arrest statistics, and the checkpoint was operated under safe conditions. The checkpoint was somewhat effective in deterring drunk driving. We hold that the sobriety checkpoint in this case, all things considered, was constitutional under Article I, Section 11 of the Indiana Constitution. Therefore, the trial court did not abuse its discretion when it admitted the evidence discovered pursuant to Gersdorff's stop at the sobriety checkpoint.

# CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion in admitting the evidence seized following Gersdorff's stop at a constitutionally reasonable sobriety checkpoint

Affirmed.

Crone, J. and Altice, J. concur